**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| | Case No. |
| Little River Healthcare Holdings, LLC *et al.*, | 18-60526-rbk |
| | (Jointly Administered) |
| Debtors. | |
| | Adversarial Proceeding No. |
| | 20-AP-06093 |
| James Studensky, Chapter 7 Trustee for Little River Healthcare Holdings, LLC, *et al.*, | |
| Plaintiff, | |
| v. | |
| UnitedHealthcare Insurance Company, *et al.*, | |
| Defendants. | |

## UNITED'S POST-TRIAL BRIEF

Defendants UnitedHealthcare Insurance Company; United Healthcare of Texas, Inc.; UnitedHealthcare Benefits of Texas, Inc.; and UnitedHealthcare Community Plan of Texas, LLC (collectively, "United") hereby submit this post-trial brief.

# Table of Contents

I.    INTRODUCTION ........................................................................................................... 1

II.    LEGAL STANDARD.................................................................................................... 6

III.    INTRODUCTION ......................................................................................................... 7

    A.    The only parties to the Agreement were United and Little River. ...................................... 7

    B.    The Agreement permitted United to deny claims or pay claims at less than ███████ ████ for numerous reasons....................................................................................... 8

    C.    United's Administrative Guide is incorporated into the Agreement and binding on Little River...................................................................................................... 11

    D.    This Court is not collaterally estopped from interpreting the Agreement and Administrative Guide based on their plain language. ....................................................... 15

IV.    ARGUMENT .............................................................................................................. 16

    A.    The Trustee has no evidence to support his breach-of-contract claim............................. 16

        1.    The Trustee does not take issue with United's claim adjudication process......... 16

        2.    The only evidence of United's claim adjudication offered at trial—United's internal data—does not prove any breach........................................................... 18

            i.    The United data does not show entitlement to payment. ...................... 18

            ii.    The Trustee's contract theory is necessarily dependent upon Herbers' use of United's data to show that United adjudicated a claim on a contractually prohibited basis. ................................................................ 19

            iii.    The Trustee's inclusion of "UP" claims in his damages calculations misunderstands the Agreement and United's position regarding timely filing.......................................................................................................... 21

            iv.    Claims adjudicated as "HU" are not a breach of the Agreement............ 22

        3.    Under Mr. Herbers' methodology, the Trustee did not prove damages.............. 23

    B.    The Trustee's breach-of-contract claim otherwise fails because he cannot show entitlement to payment under the contract and Little River itself breached the contract.. 24

        1.    The lab claims at issue are not payable because the testing was not done at Little River. 25

        2.    The Trustee has no evidence that Little River performed the laboratory testing at issue. 28

        3.    Little River failed to appeal United's claim denials before filing suit............................. 35

        4.    Little River breached the Agreement by paying kickbacks to physicians. ..................... 39

            i.    The undisputed evidence shows that Little River paid kickbacks. ........ 39

            ii.    Claims tainted by kickbacks are not payable.......................................... 42

    C.    Because the Trustee cannot establish breach, his statutory claims fail............................. 45

    D.    The Trustee has failed to rebut the prima facie case in United's proofs of claim............ 46

V.    CONCLUSION ........................................................................................................... 49

---

## I.  INTRODUCTION

The Trustee defeated United's motion for summary judgment on the promise that he would present evidence at trial that could at least make the Court's judgment uncertain. When asked during his cross examination whether he intended to deliver on that promise, the Trustee admitted that he could not. He agreed to the kind of evidence that he would have to present in order to support his allegations, and then admitted that the Court would not see a shred of it at trial. And he was correct in that prediction. The record contains no evidence that would allow the Court to enter judgment in the Trustee's favor.

Introductory trial advocacy courses teach law students the basic skill of lining up the key elements of each cause of action with *evidence* that will be introduced at trial. Such charts are used to train law students to put in the evidentiary proof, on an element-by-element basis, necessary to win judgment in their client's favor. United has replicated such a table below, while adding a column identifying the evidence the Trustee's own witnesses agreed would exist if the Trustee had a valid claim. This chart makes abundantly clear the blatant evidentiary shortcomings for each and every key element of the Trustee's claim.[1] More specifically, the "Evidence" column is blank precisely because the Trustee failed to introduce any evidence whatsoever to prove either performance or breach, and no reliable evidence to prove damages for any specific lab claim at issue. As a result, judgment must be entered in United's favor.

---

[1] Indeed, United has ***repeatedly*** invited the Trustee to explain what specific evidence the Trustee contends supports his claims—at the summary judgment stage, at the trial stage, and at the Rule 52 stage—and the Trustee has repeatedly failed to do so. Because he has no such evidence.

| Element | Factual Evidence that Should Exist | Evidence Introduced by the Trustee | Result |
|---|---|---|---|
| Performance by Little River | - Lab orders from physicians to Little River<br>- Medical records for the labs at issue<br>- Evidence that Little River performed lab work at a Little River location<br>- Evidence that Little River ordered additional lab work from reference labs<br>- Results/reports from reference labs back to Little River<br>- Reports of all lab work from Little River to physicians/patients | - | **Judgment for United** |
| United breached | - An improper claim denial or a payment from United that is less than the amount owed under the parties' Agreement, after accounting for all applicable member copayments, coinsurance and deductibles | - | **Judgment for United** |
| Damages | - A supported, reliable, and objective damages calculation tied to the specific lab claims for which United breached | -<br><br>(Herbers testimony unreliable and unsupported, and untethered to specific breach claims) | **Judgment for United** |

Moreover, a competent evaluation of United's claims data—the only basis for the Trustee's claims—establishes beyond any reasonable doubt that every claim the Trustee has put at issue was actually paid in a manner permitted by the contract. Where United did not pay a claim at ███████, it had a reason that the Trustee concedes was appropriate—reasons including the claim being untimely submitted by Little River, a claim that lacked the contractually-mandated documentation supporting the service, or a claim for which the United payment reflects the difference between its member's payment (*e.g.*, copay, coinsurance, or deductible) and ███████████

Why the Trustee would waste Estate assets and judicial resources on a trial without first ensuring that he had some sort of case to make, United cannot answer. But the answer to how the Court must rule in this case is now beyond debate—judgment must be entered in United's favor.

The path to that decision is as easy as it gets: a plaintiff must carry his burden of proof through evidence; the Trustee has not presented any such evidence. The Court can, and should, ignore all of the various hypotheticals the Trustee presented at trial because none of them are material to its decision—they either require re-writing the contract, ignoring the evidentiary record, or both.

The same is true for United's proofs of claim. The Trustee was required to rebut United's bases for claiming $39 million in overpayments using actual evidence. He did not do so. The record indisputably confirms that Little River did not perform the tests for which those payments were made at a location covered by the contract—or at least the Trustee could not make the required showing that it did. Moreover, the claims were procured in violation of United's policy forbidding payments to doctors for referrals and Little River's contractual commitment not to violate state law—in this case the Texas Patient Solicitation Act.

The Trustee essentially conceded those facts at trial; but attempted to escape their consequence by urging a misreading of the contract. For example, the Trustee asks the Court to read out of the contract the clear language limiting covered claims to ██████████████ ██████ and to ignore the undisputed binding prohibitions against payments for referrals. It would be clear error for the Court to accept the Trustee's invitation to fundamentally change the bargain the Parties reached, and it should not do so.

The Trustee asked for his day in Court and he got it. If there were a case to be made against United, he certainly would have made it. That he could not come up with a witness or a document that justified his filing the case in the first instance is as telling as it is troubling. And it is dispositive.

However, even were the Court to go beyond the Trustee's failure to present evidence at trial supporting his claims, the flow chart below addresses the numerous additional reasons the Trustee's claims fail—starting with the Trustee's failure to prove breach and moving through each of the other issues in the case.

# What Trustee Must Prove to Prevail



No matter what, judgment must be entered in United's favor.

## II. LEGAL STANDARD

Because this case was tried without a jury, the Court is the fact finder and must articulate its findings of fact and conclusions of law based on the evidence presented at trial, before rendering a decision. Fed. R. Civ. P. 52(a). In other words, the Court must analyze the factual evidence submitted by the parties at trial, weigh that evidence, and based on that evidence alone—not attorney argument— make findings of facts and conclusions of law. The purpose of articulating these findings and conclusions is three-fold: "1) aiding the trial court's adjudication process by engendering care by the court in determining the facts; 2) promoting the operation of the doctrines of res judicata and estoppel by judgment; and, 3) providing findings explicit enough to enable appellate courts to carry out a meaningful review." *Chandler v. City of Dallas*, 958 F.2d 85, 88 (5th Cir. 1992) (citation omitted). Findings of fact are particularly important where, as here, the trial court's decision will turn in part upon factual determinations. *Id*. at 89.

The Trustee bears the burden to prove his claims against United by a preponderance of the evidence—*i.e.*, he must show that his "version of the events is more likely than not true." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015); *see also Sears, Roebuck & Co. v. AIG Annuity Ins. Co*., 270 S.W.3d 632, 637 (Tex. App. 2008) ("The plaintiff in any breach of contract case bears the burden of proving the breach."). To prevail on his breach of contract claim, the Trustee "must prove there was a (1) valid contract (2) where [Little River] performed, (3) but [United] breached, (4) and that breach damaged [Little River]." *Hill v. Concho Res., Inc*. 634 F. Supp. 3d 359, 363 (W.D. Tex. 2022); *see also Correa v. Salas*, No. 05-13-01478-CV, 2014 WL 7399306, at *2 (Tex. App. Dec. 17, 2014) (reversing trial court judgment in favor of breach-of-contract plaintiff where plaintiff had offered no evidence to prove her performance or defendant's breach).

In interpreting the meaning of the contract at the heart of the Trustee's claims, the Court must "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original). The contract is unambiguous if it "is so worded that it can be given a certain or definite legal meaning or interpretation." *Id*. The fact that the parties disagree about the interpretation of the contract does not make it ambiguous. *See Rustic Nat. Res. LLC v. DE Midland III LLC*, 669 S.W.3d 494, 500 (Tex. App. 2022), *review denied* (June 21, 2024). But even if a contract is unambiguous, a court may consider "the objective facts and circumstances surrounding the context of the parties' contract as an aid in the construction of the contract's language." *Id*. at 501; *see also Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc*., 590 S.W.3d 471, 483-84 (Tex. 2019) (considering fact that parties were sophisticated entities with "extensive experience" in the industry to "aid in the construction of the contract's language" (quoting *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017))).

## III.    BACKGROUND

The 2014 Facility Participation Agreement ("Agreement") lies at the center of this case. (DTX-03.) While much attorney argument has been offered about the meaning of that Agreement, the reality is that the terms are clear and immutable; the Court does not need to look beyond the Agreement's plain text to conclude that United fully complied with its responsibilities therein.

### A.    The only parties to the Agreement were United and Little River.

There is no question that the only parties to the Agreement were United and Little River. (DTX-03 at 1; June 13 Trial Tr. 487:22-488:6, 489:1-22 (Martino).)[2] The undisputed purpose of

---

[2] Citations to witness testimony are provided throughout this brief to emphasize that even if the plain language of the Agreement were not clear, the weight of witness testimony supports the articulation of the Agreement's terms provided here.

the Agreement is for United "to make [Little River's] services available to [United's] Customers," and for Little River "to provide such services, *under the terms and conditions set forth in [the] Agreement*." (DTX-03 at 1 (emphasis added).)

**B.      The Agreement permitted United to deny claims or pay claims at less than ███ ████████ for numerous reasons.**

The parties intended for Little River to provide services and to bill those services to United—but agreed that United was not required to pay Little River for every claim it billed in the exact amount that Little River charged. Instead, the Agreement specifies *which* claims were payable—defining the scope of services covered, the requirements Little River had to follow in providing and billing those services, and the amount of Little River's charges that United had to pay.

As an initial matter, there can be no dispute that the Agreement only required United to pay for "Covered Services" provided to United members and covered by the member's benefit plan with United (DTX-03 at 1 (Sections 1.2 and 1.4).) Moreover, the Agreement did not apply to *every* benefit plan offered by United. (DTX-03 at 22 (Appendix 2); June 13 Trial Tr. 505:17-24 (Martino).)

The Agreement also covered *only* ██████████████████████████



---

[3] It is undisputed that ████████████████ Boston Heart's laboratory in Massachusetts or True Health's laboratories in Richmond, Virginia, and Frisco, Texas. ████ *see also* June 13 Trial Tr. 498:11-22 ████████████ ████████ June 17 Trial Tr. 1296:1-7) (Boston Heart located in Massachusetts); DTX-1800 at 8 (True Health presentation listing locations in Richmond, Virginia, and Frisco, Texas); June 18 Trial Tr. 1403:10-17 (True Health's labs were in Richmond and Frisco).)

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████

████████████████████████████ *see also* June 13 Trial Tr. 496:2-10, 497:22-498:1

(Martino); June 20 Trial Tr. 1845:9-1846:19 (King).)

The plain language of the Agreement also makes clear that ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

The Agreement also imposed additional requirements on Little River related to claim

submission. For example, ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

Taken together, these provisions make clear—and no one disputes—that just because Little

River *billed* a claim to United does not mean it was *payable* under the Agreement or even payable

at ████████████████. As United's industry expert, Carl King, explained: "[A bill] is a request

for payment. The bills are supposed to be true, correct, and complete. . . . But a bill does not provide

evidence that a service was delivered." (June 20 Trial Tr. 1877:5-20; *see also* June 13 Trial Tr.

494:11-17 (Martino); Downton Depo. (ECF No. 519, Ex. B) 31:1-8 (acknowledging that payments under the contract were subject to contract's terms).) Instead, these and other provisions of the Agreement dictate *which* claims were reimbursable by United, and on what terms.

Based on a plain reading of the unambiguous terms of the Agreement, there can be no dispute that Little River was only entitled to payments where it fully complied with the Agreement's terms. United owed nothing for a service that did not meet the definition of a "Covered Service" (*i.e.*, a service that was covered by the member's benefit plan); United owed nothing for ████████████████████████████████; and United owed nothing for a service that was not supported by the medical records that Little River committed to maintaining and producing upon request.

Finally, even where United may have had an obligation to pay a claim, the contract rates applicable to laboratory services under the Agreement were clear: United agreed to reimburse Little River ████████████████ for outpatient laboratory services—*otherwise covered by the Agreement*—provided *by Little River* to United's members who were enrolled in a covered commercial benefit plan, less any applicable member financial responsibility (*e.g.*, deductible, coinsurance, or copayment).[4] (DTX-03 at 29 (Section 2.1 of All Payer Appendix ("For Covered Services *rendered by Facility* to a Customer, the contract rate will be…" (emphasis added)), 26 ("Applicability" section of All Payer Appendix), 33 (Table 2 of All Payer Appendix); June 13 Trial Tr. 539:20-540:7 (Martino).) United was not required to pay ████████████, however, for services rendered by providers *other* than Little River, to non-United members,

---

[4] The 2014 Facility Participation Agreement was amended in 2017. (PTX-65.) The only effect of that amendment was to change the contracted rate United would pay for Little River's services. (*Id.*) Thus, for laboratory services rendered after October 1, 2017, United agreed to pay Little River for laboratory services based on a set fee schedule. (*Id.* at 8.)

United members enrolled in a Medicare or Medicaid plan, or to United members enrolled in a commercial benefit plan not covered by the Agreement. (DTX-03 at 80 (section 2.3 of Medicare Advantage Appendix), 64 (Table 2 of Medicaid Payment Appendix); June 13 Trial Tr. 507:5-10, 508:3-5, 509:17-510:14 (Martino).)

### C.   United's Administrative Guide is incorporated into the Agreement and binding on Little River.

The Court need only apply the unambiguous terms of the Agreement described above to the evidence presented at trial in order to rule in United's favor, without ever getting to the Administrative Guide. The Trustee did not present any factual evidence showing any instance where United improperly paid any claim under the Agreement, and that is dispositive to each of the Trustee's causes of action. That said, the Administrative Guide, which is incorporated into the Agreement and binding on Little River, confirms that a judgment in United's favor is required.[5]

The Trustee takes the position that the Administrative Guide did not apply to Little River. He is wrong. "Unsigned documents may be incorporated into the parties' contract by referring in the signed document to the unsigned document." *Bob Montgomery Chevrolet, Inc. v. Dent Zone Companies*, 409 S.W.3d 181, 189 (Tex. App. 2013); *Martinez v. Affordable Seating, Inc.*, No. 13-16-00103-CV, 2016 WL 6124129, at *2 (Tex. App. Oct. 20, 2016) ("The specific language used to refer to the incorporated document is not important as long as the signed document 'plainly refers' to the incorporated document."). Here, there is no dispute that the Agreement itself makes *repeated* references to Little River's obligation to comply with United's policies and protocols, including United's Administrative Guide:

---

[5] The Administrative Guide is published annually. The provisions of the Guide relevant to this suit were substantively identical from 2014-2017. (*See* DTX-457 (2014 Guide); DTX-458 (2015 Guide); DTX-459 (2016 Guide); DTX-460 (2017 Guide).) Throughout this brief, United cites to the 2016 version (DTX-459) of the Guide unless otherwise noted.

Section 1.7: "Protocols are the programs, protocols and administrative procedures adopted by United or a Payer to be followed by Facility in providing services and doing business with United and Payers under this Agreement. . . ."

Section 2.1(v): "Facility has been given an opportunity to review the Protocols and Payment Policies. . . ."

Section 4.4: "Facility will cooperate with and be bound by United's and Payers' Protocols. . . . The Protocols will be made available to Facility online or upon request. Some or all Protocols also may be disseminated *in the form of an administrative manual or guide* or in other communications. . . . United may implement changes in the Protocols without Facility's consent if such change is applicable to all or substantially all of the facilities in United's network located in the same state as Facility." (emphasis added)

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(DTX-03 at 2, 5-6, 10.) The Additional Manuals Appendix attached to the Agreement also refers to the "UnitedHealthcare Physician, Health Care Professional, Facility and Ancillary Provider Administrative Guide" as a "UnitedHealthcare Protocol[]." (DTX-03 at 24.)

These repeated references to the Administrative Guide throughout the Agreement are more than sufficient to incorporate the Administrative Guide into the Agreement by reference under Texas law. And that conclusion is reinforced by the testimony of United's industry expert Mr. King, who testified that the provisions used in the Agreement to incorporate the Administrative Guide by reference are industry standard. (June 20 Trial Tr. 1894:19-1895:10, 1896:12-16, 1897:17-23, 1898:7-1899:8, 1900:9-1901:17.)

In his pre-trial brief, the Trustee cited *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.* as support for his position that the Administrative Guide is not binding on Little River. But the *One Beacon* case actually supports United's position that the Administrative Guide is incorporated into the Agreement. In *One Beacon*, the Fifth Circuit applied traditional contract principles to determine whether an indemnity clause contained in the defendant's online terms and conditions

was incorporated by reference into the contract. 648 F.3d 258, 266-70 (5th Cir. 2011). In reaching its conclusion that the indemnity clause *was* incorporated into the parties' written contract and binding on the plaintiff, the court noted that the written contract provided it was "issued in accordance with the purchase order terms & conditions" on defendant's website, and that any reasonable person would have been able to easily find those terms—which included the indemnity clause—by navigating the defendant's website, even though the contract itself did not contain a direct link to those terms (or the at-issue clause). *Id*. at 263, 269.

Here, United's employee, Chad Martino, testified that United's Administrative Guide is continuously available to all of its participating providers, including Little River, via United's online provider portal. (June 13 Trial Tr. 523:11-21 (Little River represented and warranted that it had received and reviewed United's Administrative Guide at the time it signed the Agreement), 515:8-10 (Little River never complained about being bound by Administrative Guide), 517:4-19 (explanation of how United communicates updates and changes to its Administrative Guide to providers), 525:3-22 (describing United's online provider portal).) And Mr. King testified that it is "standard operating procedure" in the healthcare industry for payors to make their administrative guides and policies available online because it is "the best way to access these dynamic policies" and the practice is "well utilized and understood by providers." (June 20 Trial Tr. 1900:9-19); *see also One Beacon*, 648 F.3d at 263, 269 (noting any reasonable person could find and understand terms on website that were incorporated into their contract). Mr. King further testified that, based on his industry experience, providers would not be confused about which policies or protocols apply to them just because they were made available online. (June 20 Trial Tr. 1901:4-17.) In addition, he testified that it is customary "with all the major carriers and all the provider contracts"

to incorporate administrative guides into facility contracts and that it is "a very, very common way to approach the complexity in the health insurance industry." (June 20 Trial Tr. 1892:23-1893:11.)

The Trustee offered nothing to rebut Mr. Martino's or Mr. King's testimony, and nothing in the plain language of the Agreement supports the Trustee's positions. No one from Little River testified about a belief, reasonable or otherwise, that the Administrative Guide did not apply to Little River. In fact, the Trustee's *own* expert witness, Ms. Nelson, acknowledged that United's Administrative Guide is referred to and specifically mentioned in the Agreement and agreed that it is "customary in the industry for payors to incorporate administrative guides like the one at issue in this case into their contract[s] with facilities." (June 12 Trial Tr. 199:24-200:6, 200:10-15, 203:18-22.)[6]

Under United's Administrative Guide, the Court cannot enter judgment in the Trustee's favor because (a) the laboratory services claims at issue were the result of illegal payments made to the ordering physicians, and/or (b) Little River did not exhaust the administrative appeal process for any of the claims at issue.

---

[6] Ms. Nelson's and Mr. King's testimony is supported by caselaw. Courts nationwide often do not even question the validity of the incorporation by reference of administrative guides into payor-provider contracts. *See, e.g., Blue Cross Blue Shield of Michigan v. Bond Pharmacy, Inc.*, No. 21-10076, 2024 WL 1349073, at *1 (E.D. Mich. Mar. 29, 2024) (noting that a provider agreement "incorporates by reference BCBSM's Provider Manual and its Medical Policy," which all together comprise the "Agreement"); *Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc*., 376 F. Supp. 3d 1298, 1307 (S.D. Fla. 2019) (finding administrative guide incorporated into larger agreement where "the provider agreed to comply with policies and procedures that could be amended or revised from time to time in one party's discretion, so long as the amendments or revisions do not contradict express terms in the original agreement."); *N. Shore Home Med. Supply, Inc. v. Catamaran PBM of Illinois, Inc.*, No. CV 15-12874-RWZ, 2015 WL 4481776, at *1 (D. Mass. July 21, 2015) ("The Provider Agreement governs the relationship between the parties and incorporates by reference a provider manual"); *Express Scripts, Inc. v. Apothecary Shoppe, Inc.*, No. 4:12CV01035 AGF, 2013 WL 5491873, at *1 (E.D. Mo. Sept. 30, 2013) ("The Agreement incorporates by reference Plaintiff's Provider Manual that includes procedures for claims submission, payment, and audit.").

**D.     This Court is not collaterally estopped from interpreting the Agreement and Administrative Guide based on their plain language.**

In his pre-trial brief and at trial, the Trustee argued that a ruling from a different matter, *Mission Toxicology LLC v. Unitedhealthcare Ins. Co.*, 499 F. Supp. 3d 350 (W.D. Tex. 2020), is binding on this Court, purportedly on the basis of collateral estoppel. Not so. A plaintiff can only rely on offensive (nonmutual) collateral estoppel—*i.e.*, estoppel against a defendant who litigated an issue with another party—in narrow circumstances, including where the plaintiff shows that (1) "the issue under consideration is *identical* to that litigated in the prior action," (2) "the issue was *fully* and vigorously litigated in the prior action," and (3) "the issue was necessary to support the judgment in the prior case." *Amaya v. City of San Antonio*, 980 F. Supp. 2d 771, 777 (W.D. Tex. 2013) (emphasis added). None of these elements are met here.

The *Mission Toxicology* court did not draw any conclusions about the meaning of United's contract in that case. It simply found a fact dispute existed as to a third-party lab's ***understanding*** of that contract. *Id.* at 364-65. The issues in this case and *Mission Toxicology* are not identical— whether another lab knowingly interfered with a contract between United and a different hospital is of no moment here. The issue was not fully and vigorously litigated, as summary judgment is not a final judgment.[7] As a result, the meaning of United's contracts was not necessary to the *Mission Toxicology* court's judgment, because the disposition—***denial*** of summary judgment— did not rest on the issue's resolution. Nor has the Trustee introduced any evidence whatsoever to

---

[7]    The Trustee argues that the "final judgment" element of collateral estoppel is not dispositive, relying on an out-of-circuit case. (ECF No. 478 at 19 (quoting *Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390, 393 (7th Cir. 1986)). The Trustee's position blatantly contradicts the law in the Fifth Circuit, which follows a "strict approach to finality" and is binding on this Court. *TQ Delta, LLC v. CommScope Holding Co., Inc.*, 657 F. Supp. 892, 903 (E.D. Tex. 2023) (quoting *Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 230 (5th Cir. 2018)).

show that the contractual provisions at issue here and in *Mission Toxicology* are the same. In short, *Mission Toxicology* is neither binding nor persuasive here.

## IV.    ARGUMENT

### A.    The Trustee has no evidence to support his breach-of-contract claim.

The heart of the Trustee's case is that United purportedly misadjudicated—and underpaid—claims Little River billed to United between 2016 and 2018, in violation of the 2014 Facility Participation Agreement (and its 2017 Amendment). (June 10 Trial Tr. 34:8-10, 84:19-20 (Trustee's opening argument).) In order to succeed on that breach-of-contract theory, the Trustee's burden at trial was to prove by a preponderance of the ***evidence*** that United paid Little River less than the contract required. But the case has now been tried, the evidence is in, and the Trustee has not and cannot meet his burden. There is ***no evidence*** that United improperly adjudicated or underpaid any claims. Instead, the evidence shows that United complied with the contract at every turn. Accordingly, the Court should render judgment in United's favor.

### 1.    The Trustee does not take issue with United's claim adjudication process.

To better understand what the Trustee did ***not*** prove, it is important to recognize what the evidence ***did*** show:

Health care providers like Little River submit medical claims to United for reimbursement either electronically or on an industry-standard form called a UB-04. (June 17 Trial Tr. 1085:4-19 (Smith); PTX-78.) Regardless of how a claim is submitted, though, the information it contains is the same: information about the patient, the services rendered by the provider, relevant diagnoses, and the charges billed by the provider. (June 17 Trial Tr. 1086:11-23 (Smith).) After receiving a claim, United then processes it in one of three ways: accepts the claim and pays it, requests more information from the provider or member, or denies the claim.

To process a claim, United compares the information submitted by the billing provider against criteria pulled from the contracts governing the claims. (June 17 Trial Tr. 1073:5-20, 1074:6-1075:1, 1077:2-7, 1077:12-1078:2 (Smith).) Those criteria include determining whether the patient on whose behalf the claim was submitted is a United member; whether the member's benefit plan covers the service that was billed; whether the provider who billed the service is a participating provider in United's network; and evaluating the provider's contract terms, including the contract rates that apply to services and the contractual timely filing period. (*Id.*) United then adjudicates the claim based on its comparison of the claim information to the contract criteria. United may, for example, deny a claim if ███████████████████████████ ████████████████████████████████████████████ ███████████ (June 17 Trial Tr. 1078:12-16 (Smith).)

The Trustee does not challenge United's claim adjudication process and admits that United had many contractually permissible reasons to deny claims. For example, the Trustee's expert, Mark Herbers, admitted that United was entitled to pay a claim ██████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████. Mr. Herbers attempted to exclude from his damages calculations all claims where United's claims data indicated one of those adjudication reasons. (June 11 Trial Tr. 222:13-223:23 (Herbers).) Therefore, in order to establish a breach—*i.e.*, that United adjudicated and paid claims in violation of the Agreement—the Trustee was required to prove that the reason United gave for paying any claim as it did was ***not*** permitted under the Agreement. He did not do so for any claim. Nor could he have, as the evidence confirms that every claim at issue was adjudicated in a matter that was appropriate under the Agreement.

**2. The only evidence of United's claim adjudication offered at trial—United's internal data—does not prove any breach.**

To reiterate, the Trustee's contract claim depends on proving that United breached the Agreement because its reasons for paying claims as it did were not permitted under the Agreement. To do this, the Trustee relied exclusively on demonstrably incorrect misinterpretations of United's claims data by his purported expert, Mr. Herbers. But Mr. Herbers' interpretations of United's data **cannot** and **did not** prove any breach. Mr. Herbers did not consider the evidence underlying any claim—relying instead on his personal interpretation of a dataset which he lacked the qualifications to understand and which, without more, could not answer the question Mr. Herbers and the Trustee put to it. Nevertheless, the Trustee placed the fate of his claims in Mr. Herbers' hands alone—even while Mr. Herbers disavowed any opinion regarding whether a breach occurred, limiting his analysis to the damages incurred **if** the Trustee could otherwise establish a breach (June 11 Trial Tr. 14:13-15, 74:5-16; June 13 Trial Tr. 269:25-270:5 (Herbers).)

> **i.** **The United data does not show entitlement to payment.**

The United claims data Mr. Herbers' analysis relies upon was presented at trial in the form of large spreadsheets. At most, the data shows what Little River billed for, and the reason United provided for paying the claim as it did. It does not say whether Little River was actually owed *anything* under the contract—*i.e.*, whether the hospital had performed services in compliance with its contractual obligation.

As United's expert Jeffrey Buchakjian explained: "[C]laims data is transaction-level data that includes various fields associated with the procedures that were performed, information about the patient and its plan and how those claims were ultimately adjudicated by a payor." (June 13 Trial Tr. 587:1-6 (Buchakjian); *see also id.* at 590:8-598:19 (explaining fields included in United's claims data).) In other words, United's claims data is a snapshot of the information that was exchanged

---

between the provider (here, Little River) and United in the course of adjudicating a claim. However, it is not primary evidence of the underlying *facts* of any claim—for instance, the data does not incorporate a patient's medical records that would support (or not) the service being billed.

The Trustee inexplicably[8] elected to omit factual evidence related to each claim (the physician's order for lab testing submitted to Little River, Little River's report of the lab work it performed, Little River's order for lab testing to reference labs (*i.e.*, Boston Heart or True Health), reports of the reference labs' work to Little River, or Little River's comprehensive report of all the lab work provided to the physician) from the presentation of his case to the Court. The Trustee relied solely on his own testimony and the testimony of his two purported experts—even as the Trustee, Mr. Herbers, and Ms. Nelson all admitted they lack any firsthand knowledge of any services performed by Little River or any claim submitted by Little River to United. (*E.g.* June 10 Trial Tr. 210:20-211:3, 279:13-18, 281:13-21 (Studensky); June 11 Trial Tr. 92:21-93:3 (Herbers); June 12 Trial Tr. 139:7-9, 140:25-141:4 (Nelson).) Simply put, the Trustee's case was void of any factual evidence that could possibly support judgment in his favor.

       **ii.**    **The Trustee's contract theory is necessarily dependent upon Herbers' use of United's data to show that United adjudicated a claim on a contractually prohibited basis.**

Because United's claims data is not primary evidence of the facts underlying a claim, the ***only*** claims for which the data alone could be used to prove that any claim was improperly adjudicated under the Agreement are those where United's data reflects that United denied a claim for a reason ***expressly prohibited by the Agreement***. For example, if United's data indicated that a claim was denied

---

[8] As explained in United's Motion for Sanctions for Spoliation of Evidence (ECF No. 516), the Trustee admitted to having access to Little River's medical records at the time he initiated this lawsuit against United (June 10 Trial Tr. 232:25-233:13), but "lost access" to those medical records sometime during the course of the litigation (*id*. at 231:17-21), despite Little River's duty to maintain access to the health records of its patients. (*Id*. at 214:17-19; DTX-3 at 7 (Section 4.1).)

---

because the service was provided on a Saturday, the Trustee could point to that claim as a breach of the Agreement because there is nothing in the Agreement that says a claim isn't payable just because the service occurred on a certain day of the week.

This type of analysis appears to be what Mr. Herbers was ***attempting*** to do by categorizing United's claim adjudication codes (and reasons) into two groups—those that should be included in his damages analysis and those that should not be included. But Mr. Herbers completely failed at the task. His opinions are unreliable, unhelpful, inadmissible, and can be afforded no weight.

***First***, Mr. Herbers conceded that he had ***no opinion*** about whether any claim was payable under the Agreement. (June 13 Trial Tr. 269:25-270:5.) Put another way, by his own admission, Mr. Herbers offers no basis for the Court to conclude that any of United's adjudication decisions were impermissible under the contract. ***Second***, Mr. Herbers proved himself utterly incapable of interpreting United's data—the only item on his to-do list at trial—in a coherent or reliable manner. Mr. Herbers had ***no idea*** what he was doing when he reviewed the data. He conceded that he had no experience interpreting United's data; he made no effort to educate himself on how to interpret the data (he made no effort to talk to any United employee, he did not coordinate with the Trustee's counsel on discovery aimed at better understanding United's data, and he did not review any of the lab orders, medical records, claim forms, or other documents underlying any of the claims within the United claims data); and that, in each of the ***four*** untimely attempts he made to analyze the data, he made obvious mistakes that resulted in vastly overestimating the Trustee's damages. (June 11 Trial Tr. 96:1-99:20, 238:20-239:16 (Herbers).)[9]

---

[9] As explained more fully in United's renewed motion to exclude Mr. Herbers' testimony, the Court cannot rely on any conclusion offered by Mr. Herbers in support of the Trustee's case.

###### iii. The Trustee's inclusion of "UP" claims in his damages calculations misunderstands the Agreement and United's position regarding timely filing.

At trial, the Trustee presented for the first time a theory that he contends would entitle him to damages despite his admission that United denied the claim properly in the first instance. Mr. Herbers was unequivocal at his prior depositions and in his prior disclosure that if United denied a claim as being untimely filed, there could be no damages attributable to that claim. But he incompetently failed to recognize that the code United used for that reason in its internal data was "UP." For that reason, and that reason alone, he mistakenly included "UP" claims in his initial damages calculations. When his error was pointed out to him at his second deposition, Mr. Herbers removed those claims from his damages universe. At trial, the Trustee tried to cram them back into the damages bucket on the silly theory that United was required to plead "timely filing" as an affirmative defense. That is wrong as a matter of fact and law.

There is no dispute that United informed Little River at the time of its adjudication of the claims at issue each time that the claim was being denied for being untimely filed. And there is no dispute that United was entitled to do that.[10] So where is the breach when United exercised its contractual right for claims coded as "UP" internally? The Trustee offers no answer. But to prove a breach for "UP" claims, the Trustee was required to show that the claims were timely filed. And he did not do so—nor could he have, as the data answers that question in indisputable fashion (comparing the date of service to the claim submission date).

---

[10] ████████████████████████████████████████████████████████████████

Moreover, the timely claim submission requirement is not a condition precedent—instead, it is one of many conditions defining the scope of claims that were payable under the Agreement. Submitting an untimely claim simply means that Little River billed for claims that were not payable under the Agreement—and United had the contractual right to deny payment in whole or in part, which it did. The Trustee filed suit claiming that United's denial was a breach. Consequently, it is the Trustee's burden to prove that each claim was payable (*i.e.*, that it was timely filed). He did not even try to do so.

### iv. Claims adjudicated as "HU" are not a breach of the Agreement.

After the cross examination of Mr. Herbers, the Trustee appeared to (finally) acknowledge the disaster that is Mr. Herbers' work product. The re-direct of Mr. Herbers suggested a last-ditch effort to salvage a tiny fraction of the case the Trustee originally brought by abandoning all breach claims except those where the United data reflects an "HU" adjudication code. (June 11 Trial Tr. 293:20-296:17.). In the dying breath of his contract claim, the Trustee argued that United denied those claims because an entity other than Little River performed the service—contending that was an improper reason under the contract. (*Id.*) The Trustee is wrong again as a matter of law and fact.

As a matter of *law*, United was well within its rights to deny claims performed by an entity other than Little River. As explained more fully below, the Agreement is clear: it applies *only* to services provided *by* Little River.

Accordingly, for the Trustee to even begin to show that a claim with an HU adjudication code was not paid properly under the Agreement, he must prove as a matter of *fact* that Little River actually performed the service at issue. He did not even try to do so. The Trustee presented no documentary evidence or witness testimony regarding who performed the tests—other than confirming that it was someone other than Little River. (June 18 Trial Tr. 1427:22-1431:10 (Blum); June 14 Trial Tr.

1024:2-8) (Sheinberg); *see also* June 10 Trial Tr. at 49:10-16 (Trustee's opening statement) ("in many instances there were particular proprietary tests where really to get that exact test done, there was nobody else who could do it other than, for instance, a Boston Heart"); June 17 Trial Tr. 1251:13-1252:8 (Marioni); June 17 Trial Tr. 1284:7-16 (Salinas); DTX-06; DTX-31.).) He conceded that the only evidence that the testing was even performed at all by anyone is the United claims data—which only shows that tests were ***billed***, not that they were ***performed***. (June 11 Trial Tr. 287:21-288:5 (Herbers admitted he had only seen evidence that claims were billed, not records showing that Little River had actually performed the services); *see also* June 10 Trial Tr. 302:17-303:4 (Studensky acknowledging that a claim could be billed but not covered and it's possible that happened here); June 20 Trial Tr. 1877:5-20 (King); *see also* June 13 Trial Tr. 494:11-17 (Martino).) And the Trustee's own "expert" assumed that United's data should be taken at face value (June 11 Trial Tr. 76:14-16, 242:4-8 (Herbers))—meaning that the Court should credit United's conclusion that a provider other than Little River performed the service each time that is indicated in the data. As a result, the Trustee cannot show that any claim adjudicated with HU was a breach.

### 3. Under Mr. Herbers' methodology, the Trustee did not prove damages.

Even if the Court were to ignore both the record and the law and find that United underpaid the claims with an internal HU adjudication code, the Trustee's claim would still fail because he cannot show Little River suffered any damages. The Trustee's only "evidence" of damages is the work of Mr. Herbers. While Mr. Herbers offered at least six untimely opinions—including one as late as on re-direct at trial—he maintains that his ***methodology*** in making those determinations did not change. (June 11 Trial Tr. 108:22-109:2; June 13 Trial Tr. 258:4-11, 271:3-8.) Under that methodology, the Court must subtract overpayments United made from the total underpayments the Trustee proved. (June 13 Trial Tr. 276:16-277:19.) But in calculating the damages associated with HU claims at trial,

Mr. Herbers left out that step. (June 13 Trial Tr. 288:25-289:8.) Had he actually done the math correctly and subtracted the overpayments, he would have found negative damages—because United's overpayments far exceed any underpayments (particularly where Mr. Herbers was unable to prove any actual damages attributable to contractual breaches). (June 14 Trial Tr. 711:3-713:13.). During the contractual time period of October 2014 through September 2017, after accounting for reversals and other negative dollar amount transactions, and excluding patients with Medicare or Medicaid, the total value of United's payments to Little River exceeding ███████████ totaled $1,694,668. (PTX-86.) This overpayment amount vastly outweighs the damages the Trustee proved that Little River suffered—which are $0.

For this reason, too, the Trustee's claims fail. *See Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 465 (5th Cir. 2003) ("The plaintiff bears the burden of demonstrating that he suffered a loss as a result of the breach.").

### B. The Trustee's breach-of-contract claim otherwise fails because he cannot show entitlement to payment under the contract and Little River itself breached the contract.

Even if the Trustee had evidence that United's stated reasons for denying or allegedly underpaying claims were improper, he still could not establish his breach-of-contract claim for several reasons. ***First***, the Trustee cannot meet his burden to prove that the claims were payable under the Agreement. To do so, for each and every claim at issue, he must establish that the patient who received the testing was a member of a United plan; that the testing performed was medically necessary; the testing was performed ██████████████████████████; and that Little River performed the services at issue. He did not do so for ***any*** claim. To the extent the record contains any evidence of any lab performing the services billed to United, it indicates that third-party laboratories performed the services ████████████████████.

***Second***, Little River failed to appeal any of United's claim denials—a condition precedent to suit

under the Agreement. **Third**, and finally, even if Little River's claims were otherwise payable, Little River breached the parties' Agreement and Texas law by paying physicians for the referrals.

### 1. The lab claims at issue are not payable because the testing was not done at Little River.

The Agreement between Little River and United unambiguously required



As Mr. Martino and Mr. King both testified, limiting Covered Services to only those provided at specific locations ensured that United alone controls who has access to its network. (June 13 Trial Tr. 360:10-361:2, 495:13-497:7 (Martino); June 20 Trial Tr. 1840:13-1841:16, 1843:18-1846:19 (King).) Mr. King also explained that such provisions protect payors like United from non-contracted providers taking advantage of terms that were offered only to providers United agreed to contract with. (June 20 Trial Tr. 1843:18-1845:8 (King).) Mr. King confirmed that such limitations are standard in the industry, and that any contracted provider would understand that its reimbursement rights applied only to services it performed. (*Id.*)

Here, the Trustee set forth no evidence that any of the lab claims included in Mr. Herbers' final damages calculation were performed _____, including the OMS (d/b/a True Health) lab.[11] None. The Trustee did not even attempt to do so, and conceded he

---

[11] No evidence was put forth at trial identifying any specific test included in Mr. Herbers' damages analysis that was performed at the OMS lab. And the Court cannot assume any test was performed there, as Ms. Sharlene Blum confirmed that the OMS lab was only operational for a portion of the time frame at issue, ***never*** had the capabilities to run all of the tests ordered and was not used to run tests on patients who presented live and in-person at Little River's Rockdale hospital. (June 18 Trial Tr. 1425:16-1426:4 (OMS lab not operational until July 2016), 1433:6-14 (OMS lab shut down in March 2018), 1420:1-1421:1 (OMS lab did not provide services for Little River inpatients or ER patients), 1427:22-1431:10 (OMS lab never capable of running all tests, some always sent to Boston Heart or True Health.)

likely could not have done so based on the facts introduced at trial. (June 10 Trial Tr. 281:13-282:1 (Studensky).) For this reason alone, the Trustee's claims fail because the Trustee cannot show that Little River performed under the contract, a required element for a breach of contract claim. *See Hill*, 634 F. Supp. 3d at 363.

Beyond that, however, United affirmatively showed that the claims at issue were ***not*** ████████████████████████████████████. Numerous witnesses confirmed that the actual lab tests at issue were primarily comprised of proprietary advanced lipid testing that could ***only*** have been performed by Boston Heart and True Health at their laboratories in Massachusetts and Virginia, respectively. (June 18 Trial Tr. 1497:10-1431:10 (Blum); June 17 Trial Tr. 1251:13-1252:8 (Marioni), 1284:7-16 (Salinas); DTX-06; DTX-31.) These locations are ██████████ ██, rendering the services not payable under the plain terms of the Agreement.

The Trustee, however, contends the geographic limitations in the Agreement do not matter because according to his "expert," Ms. Nelson, the Agreement purportedly allows for the use of "subcontractors." (June 12 Trial Tr. 47:8-25.) Even ignoring the absence of any evidence that Boston Heart, True Health, or any other alleged "subcontractor" performed any test included in Mr. Herbers' operative damages report (he did not; in fact, the Trustee did not offer any evidence that any laboratory testing had actually been performed at all—the trial record is devoid of lab requisition forms, laboratory reports, etc.), the evidence at trial confirmed both that Ms. Nelson lacks the qualifications to opine on such an issue (which United is separately addressing via its post-trial *Daubert* motion regarding Ms. Nelson), and that she is simply wrong. Neither Boston Heart nor True Health were "subcontractors" of Little River.

The agreements between Little River, on the one hand, and Boston Heart and True Health, on the other hand, clearly state that Boston Heart and True Health were ***independent*** contractors.

(DTX-06 at 2 (Section 1.11); DTX-31 at 3 (¶15); *see also* June 20 Trial Tr. 1849:7-1852:5 (King).) While Ms. Nelson contended she was "not sure" she "would distinguish between subcontractors and independent contractors" (June 12 Trial Tr. 173:13-23), the two are undisputedly different. In fact, an "independent contractor" is the opposite of a "subcontractor." Under the Agreement, ■

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ An "independent contractor" takes on no such responsibilities or obligations. *See Independent Contractor*, Black's Law Dictionary (12th ed. 2024) ("Someone who is entrusted to undertake a specific project but who is left free to do the assigned work and to choose the method for accomplishing it."). (*See also* June 20 Trial Tr. 1850:8-23 (King).) As Mr. King explained, the purpose of a subcontractor provision like the one in the Agreement is "to help the facility fulfill its obligations under the agreement," not to "introduce new services that the hospital did not offer at the time the agreement was entered into," such as the lab services at issue here. (June 20 Trial Tr. 1855:25-1856:20 (King).)

Moreover, even if the labs were properly considered "subcontractors," Ms. Nelson's opinion that "the location of subcontractors providing services . . . is not restricted" has no basis whatsoever in the parties' Agreement. (June 12 Trial Tr. 47:8-25.) ████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████; *see also* June 20 Trial Tr. 1852:10-1853:4 (King).)

As United's expert Mr. King confirmed, applying the reading of "subcontractor" advanced by Ms. Nelson would destroy United's ability to control access to its own network. (June 20 Trial Tr. 1855:3-24 (King).) Any party to an existing contract with a subcontractor clause could allow

any other third party to bill under the contract (and thus access United's network), just by calling them a subcontractor. (*Id*.) This perverse outcome would allow any third party into United's network, yet the third party would have no obligation to comply with United's own rules or the contractual provisions detailed in the Facility Participation Agreement.

The Agreement's plain language is not ambiguous—for ***any*** service to be covered under the Agreement, it had to be ███████████████████████. Ms. Nelson's attempt to over-expand the "subcontractor" provision is beyond her expertise, unsupported, and demonstrably false. Because it is undisputed that tests performed at Boston Heart or True Health facilities were not ███████████████████████, and because the Trustee's "subcontractor" argument fails, the Trustee cannot prove Little River's "performance" under the contract, a required element of his breach of contract claim. *Hill*, 634 F. Supp. 3d at 363.

### 2. The Trustee has no evidence that Little River performed the laboratory testing at issue.

The claims put at issue by Mr. Herbers' final analysis are also not payable because the labs were not performed by Little River.

The Trustee does not dispute this fact. The only service he ever alleged was performed by Little River was the taking of specimens and "registering" of outpatients by a phlebotomist allegedly employed by Little River. (June 10 Trial Tr. 223:3-12 (Studensky); June 12 Trial Tr. 25:13-26:10 (Nelson).) But the Trustee never provided ***any*** evidence to show (1) who drew any of the specimens underlying the claims at issue or who employed that person; (2) that the tested specimen was drawn from a patient who agreed to be enrolled as Little River outpatient; or (3) that the patient was, in fact, enrolled as a Little River patient. In fact, ***every*** witness who was asked about the evidence supporting the Trustee's phlebotomist theory testified that they had seen ***no evidence*** to support it. (*See, e.g.*, June 10 Trial Tr. 224:16-225:1, 228:16-229:4, 267:13-268:14

(Studensky); June 12 Trial Tr. 127:11-128:1, 134:2-20; 148:2-149:18, 193:14-20 (Nelson); June 20 Trial Tr. 1540:14-23, 1541:8-17, 1552:19-22, 1556:7-14, 1558:3-7, 1781:22-1782:3 (Mancini), 1874:16-25 (King).)

But even if there were evidence to support the Trustee's theory, the fact that a Little River phlebotomist allegedly collected a specimen has absolutely no bearing on whether any test ultimately performed on that specimen could be properly billed under the Agreement. (June 20 Trial Tr. 1782:7-18 (Mancini), 1870:24-1871:8 (King).) As Mr. King explained:

> [A] phlebotomist is not a licensed healthcare provider . . . . [P]hlebotomists cannot bill on their own. They cannot provide diagnosis or treatment. In fact, they are discouraged from even discussing the results. . . . I'm a little befuddled by this whole concept of why the phlebotomist employed by Little River makes everything okay, makes them a patient. So I've looked into that, and the only thing I could find was in . . . the Medicare Claims Processing Guidelines. . . . And that whole concept of the employed phlebotomists relates to the nonpatient coverage issue. And both of those issues are *Medicare* issues that clearly do not bind or are applicable in the commercial space. So to me there has been a big to-do about the phlebotomists, but it's a *Medicare nonpatient* concept that is just simply not relevant in this case.

(June 20 Trial Tr. 1878:3-1879:19 (emphasis added).)

Instead, what the evidence *does* show is that the claims within Mr. Herbers' operative damages report are the result of Little River billing for services that, to the extent they were ever actually performed at all, were performed by independent, third-party laboratories on behalf of individuals who were not patients of Little River—individuals who never saw a Little River doctor and never stepped foot in a Little River facility. The Agreement is between Little River and United, and it could not be assigned without United's consent. (DTX-03 at 15 (Section 9.4).) And the Agreement applies only to "Covered Services rendered *by [Little River]*." (DTX-03 at 29 (Section 2.1 of All Payer Appendix) (emphasis added).)

To answer the Court's question at summary judgment, there is no "loophole" here that allows Little River to bill for work it did not perform—just an unambiguous contract with which

Little River did not comply. (June 20 Trial Tr. 1923:15-1925:13 (King).) The evidence indicates that any testing at issue in Mr. Herbers' report was performed by Boston Heart and True Health at their own private laboratories, running proprietary tests that Little River simply could not have performed. (June 18 Trial Tr. 1427:22-1431:22 (Blum); June 14 Trial Tr. 1024:2-8 (Sheinberg); June 17 Trial Tr. 1251:13-1252:8 (Marioni), 1284:7-16 (Salinas); DTX-06; DTX-31.). Little River's only role, as both Dr. Salinas and Mr. Marioni testified, and as was confirmed by Mr. Buchakjian and Mr. King, was to inject itself into the billing process to ensure that every participant in the billing scheme—the third-party labs, Little River, the doctors, and the marketers—could reap ill-gotten profits from Little River's lucrative contract rates with United. (U-DX4 at 8-10, 48-59; June 20 Trial Tr. 1910:24-1911:13.)

The scheme is explained in simple terms in DTX-81, in which a Strategic Account Manager for True Health, Chrissy Alfaro, wrote to Little River that she had a physician in Dallas that "want[ed] to run the portion [of his lab samples] that he is sending to us [True Health] through the hospital contract."



**Chrissy Alfaro**

From:   Todd Cook
Sent:   Thu 4/07/2016 1:52 AM (GMT-00:00)
To:     Chrissy Alfaro; Whitney Sitzman
Cc:
Bcc:
Subject:RE: True Health Physician

We can do it. I have CC'ed Whitney on this. Reply All with the provider(s) and she will initiate THDx process

Many thanks,
TC

From: Chrissy Alfaro [mailto:CAlfaro@TrueHealthDiag.com]
Sent: Wednesday, April 06, 2016 3:59 PM
To: Todd Cook <tcook@lrhealthcare.com>
Subject: True Health Physician

Hello Todd,
I have a physician here is Dallas that is currently sending some of his samples through Little River/Boston. He is still sending a portion of his samples to us here at True Health. He wants to run the portion that he is sending to us through the hospital contract. Are we able to do this? Essentially he already has a phlebotomist in place, we just need to get his True Health panels built in the billing system. Please let me know your thoughts.

Thanks,
Chrissy Alfaro
Strategic Account Manager
True Health Diagnostics
6170 Research Rd. Suite 211

(*See also* DTX-2019 at 2 ("Because of the size of LRHC and their great contracts they want to bill for labs themselves . . . they'd be willing to buy the test from [Boston Heart] and then bill and collect for it themselves.").)

The Trustee, through Ms. Nelson, seems to contend that the Agreement permitted Little River to bill for work performed by "reference labs." That is not consistent with the explicit terms of the Agreement, and the Trustee offered no evidence to suggest that the services at issue were performed in the manner proposed by Ms. Nelson.

Ms. Nelson did not analyze *any* evidence in reaching her purported "reference labs" opinion. She simply *assumed* that Little River was using Boston Heart and True Health as reference labs, and then opined that *if her assumptions were accurate*, the use of reference labs would be proper under the Agreement. (June 12 Trial Tr. 130:6-2 (Nelson).) But her assumption was entirely undermined by the Trustee's own presentation of evidence at trial.

The Trustee testified that if Little River were properly using Boston Heart and True Health as reference labs:

(1) The tested specimen would first have gone to Little River (but there is no evidence in the record of this—whether in the form of requisitions to Little River for at-issue tests or testimony from witnesses with firsthand knowledge);

(2) Little River would have collected data about the patient and the tests that were ordered (but there is no evidence of this in the record, either—whether in the form of medical or administrative records for at-issue tests created by Little River contemporaneously with the test order or testimony from witnesses with firsthand knowledge);

(3) Little River would perform some testing and generate results for that testing (but again, there is no evidence of Little River performing any at-issue tests or generating any results);

(4) Little River would then order additional testing from Boston Heart or True Health and send the specimen to one of those labs (but the record is devoid of any evidence that Little River ordered any at-issue tests from a reference lab or sent any specimen to any reference lab);

(5) Boston Heart or True Health would send back the lab results to Little River (but there is no evidence that any results were sent from a reference lab to Little River; in fact, Little River was unable to provide any documents associated with any at-issue lab testing when United made requests for such records as part of the claim adjudication process); and

(6)  Little River would send all of the test results to the ordering physician (but there is simply no evidence proving that Little River sent any at-issue lab testing results to physicians). (June 10 Trial Tr. 280:3-281:6 (Studensky).)

Ms. Nelson agreed that if Little River was actually utilizing reference labs, there would be evidence in the form of a first requisition or order form coming into Little River from the ordering physician, a second requisition form sent from Little River to either Boston Heart or True Health, and lab testing results coming back to Little River from Boston Heart or True Health. (June 12 Trial Tr. 130:14-22, 131:3-6.) She also agreed that if she had been shown evidence that doctors ordered tests directly from True Health or Boston Heart, she "would have to reassess" her opinion that what Little River did was proper. (June 12 Trial Tr. 133:2-14.)

But despite the Trustee and Ms. Nelson confirming that Little River should have records to show that the tests were initially ordered from Little River and then referred out to other labs (June 12 Trial Tr. 129:10-131:6 (confirming specific records that should exist)), not a shred of evidence addressing any of those steps was presented at trial to support Ms. Nelson's assumptions. (June 20 Trial Tr. 1865:4-1866:3 (King).) The Trustee did not introduce a single order for any of the tests at issue in the claims within Mr. Herbers' operative damages report—not an order from

the physician directing Little River to perform the tests, nor an order from Little River directing another lab to perform the test. (June 10 Trial Tr. 217:24-218:7, 219:18-220:6, 248:6-11, 271:14-17, 271:22-272:1 (Studensky); June 11 Trial Tr. 286:22-288:16 (Herbers).)

During the cross examination of United's final witnesses, Ms. Mancini and Mr. King, the Trustee for the first time put into evidence a limited set of requisition forms (with no explanation of the relevance of the forms submitted). (PTX-126.) ***But the Trustee never even attempted to connect a single one of those requisition forms in any way to the lab claims included in Mr. Herbers' final opinion***, exemplifying the exact reason why the Trustee's claims fail: a total failure to connect record evidence with any one of the three steps Ms. Nelson confirmed are required for the proper use of a reference lab. To be clear, the Trustee cannot excuse his failure of proof by chalking it up to his decision to not look for records supporting his claim, as he seemingly tried while on the stand.[12] It would be an abuse of discretion for the Court to credit that decision in the Trustee's favor—particularly here, where the unrebutted record confirms that there were almost certainly no records to be found in the first place, if the Trustee had fulfilled his discovery obligations.

Little River was not asked to perform the tests and did not perform the tests; and it did not order tests to be performed by another lab. That there are no records in Little River's files for tests it didn't perform or order is unsurprising. And contemporaneous communications confirm exactly that. For example, DTX-194 is an email from Little River to True Health asking for details regarding lab services performed by True Health so that Little River can bill the lab services to United. The details Little River sought included the most basic of information about the services,

---

[12] The Trustee's testimony and the apparent destruction of at least access to documents, if not the documents themselves, after suit was filed is the subject of United's Motion for Sanctions for Spoliation of Evidence, filed on June 19, 2024. (*See* ECF No. 516.)

such as the patient names and dates of service—information Little River undoubtedly would have already had if the tests were originally ordered from Little River, if Little River had sent the patients' specimens and attendant requisition forms to Boston Heart or True Health, and if Boston Heart or True Health were ***actually*** Little River's "reference labs." (June 20 Trial Tr. 1860:9-1861:10 (King).) The only plausible explanation for that exchange is that Little River's only role in the process was billing for work it did not perform for United's members who were not Little River patients (and therefore billing for work that was not payable under the contract).

Finally, the Trustee himself was unable to say whether any lab test at issue in this case was actually the result of Little River utilizing Boston Heart or True Health as a legitimate reference lab. (June 10 Trial Tr. 279:12-18 (Studensky).) Instead, the most plausible conclusion to draw is that Little River never had records to support Ms. Nelson's assumptions in the first place, because Little River did not utilize True Health or Boston Heart as a "reference lab," but instead only injected itself into the equation for purposes of billing. (June 20 Trial Tr. 1910:24-1911:4 (King).) Indeed, Jeff Madison, Little River's former CEO, refused to answer this very question based on his Fifth Amendment right against self-incrimination (Madison Stip. (ECF No. 518) ¶¶ 8-15),[13] while other third-party witnesses confirmed that Little River did not have any role in the testing. (*See, e.g.* June 17 Trial Tr. 1247:25-1248:10, 1228:2-8 (Marioni).)

The Trustee's failure of proof about whether Little River performed the tests at issue renders him unable to meet his burden to prove the "performance" element of breach of contract.

---

[13] As explained more fully in United's Motion for an Adverse Inference Regarding Certain Testimony (ECF No. 517), this Court should draw an adverse inference against the Trustee based on two witness's, Mr. Jeffrey Madison's and Dr. Charles Evans's, invocations of their Fifth Amendment rights during the present trial. *See F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 45 F.3d 969, 977 (5th Cir. 1995) (stating invocation of Fifth Amendment by nonparty witness may be used to draw adverse inference against party).

Without evidence to support a requisite element, the claim fails. *Hill*, 634 F. Supp. 3d at 363 (W.D. Tex. 2022) (proof of performance is a required element of a contract claim).

### 3. Little River failed to appeal United's claim denials before filing suit.

Even if the Trustee had shown that United misadjudicated any claim, and that the services were actually performed by Little River ███████████████████████████████, the Trustee still could not recover on his breach of contract claims because he cannot show that Little River appealed any of those claims prior to the filing of this lawsuit, as clearly required by the Agreement.

The Agreement is clear: completion of United's reconsideration and appeals process is a condition precedent to litigating the adjudication of a claim in another forum. Each of United's Administrative Guides[14] applicable during the timeframe of this dispute provides: "For disputes regarding payment of claims, you **must** timely complete the claim reconsideration and appeal process as set forth in this Guide" before proceeding with outside dispute resolution.[15] (*E.g.* DTX-459 at 84 (2016 Administrative Guide) (emphasis added); *see also* June 13 Trial Tr. 549:6-15, 551:17-23 (Martino testimony about appeals requirement).) The Agreement also indicates that Little River was required to appeal claims in order to seek reversal of any denials. (DTX-03 at 10 (Section 6.5).)

---

[14] As explained above, the Administrative Guides are incorporated into the Agreement and binding on Little River.

[15] The Administrative Guide explicitly contemplates that appeals be completed prior to initiating "arbitration" because arbitration is the form of dispute resolution required by United's provider agreements, including the Agreement here. (DTX-03 at 12 (Article VII) (requiring disputes to be submitted to arbitration).) However, this matter was never submitted to arbitration due to Little River's ongoing bankruptcy. The fact that United did not insist on enforcement of the arbitration provision of the Agreement does not excuse Little River of its obligation to appeal the claims in the first instance. This is especially true given that the claims at issue were adjudicated years before this lawsuit had been filed, so any required appeal would have been completed long before United or Little River made a decision about whether to arbitrate this dispute.

In addition to the language of the Agreement and United's Administrative Guides, the PRAs United sent to Little River explained how Little River could appeal claims before resorting to outside dispute resolution (PTX-107 at 62), and the Trustee agreed that Little River knew how to appeal claims. (June 10 Trial Tr. 252:23-25 (Studensky).) Ryan Downton, Little River's former Chief Legal Officer, also testified by deposition to his understanding that providers must generally appeal disputed claims before initiating suit against a payor. (Downton Depo 36:22-37:10. (ECF No. 520).) Accordingly, there can be no question that Little River understood that appeals were a condition precedent to filing suit. (*See* Madison Stip. (ECF No. 518) ¶¶ 38-39.[16])

In fact, the Trustee's own expert agreed that "appeals are an important part of the claims adjudication process for payers" and that "United would have an expectation that if Little River saw something that was done incorrectly . . . it should present that to United so United has an opportunity to address it in real time." (June 13 Trial Tr. 321:5-9, 321:15-22 (Herbers).) And Mr. Martino explained the practical reason why United includes appeals requirements in its contracts with providers: because it will "be a much quicker resolution [and] prompt process to reprocess those claims rather than a drawn-out six-year, seven-year litigation." (June 13 Trial Tr. 555:12-15 (Martino).)

Despite the Agreement's clear requirement to appeal claims before filing suit against United, the Trustee offered no evidence at trial that any of the claims at issue here were appealed. Nor did he offer documents indicating that anyone at Little River even *believed* a claim had been underpaid—no written correspondence with United questioning an adjudication and no notes from the billing team reflecting a call to United raising concerns about payment—even though his expert testified that based

---

[16] As explained in United's Motion for an Adverse Inference, based on Jeffrey Madison's refusal to testify to Little River's understanding of its obligations under the Agreement, the Court should infer that Madison would have testified against Little River's (and thus the Trustee's) interest as to the meaning of the Agreement. (ECF No. 517 at 7 n.6.)

on his own experience overseeing billing at a hospital, it was important for providers to be "proactive when they saw something that they th[ought] was adjudicated incorrectly" by reaching out to payors, and that the provider would keep records of those communications with payors. (June 11 Trial Tr. 77:5-79:21 (Studensky).)

Instead, United offered **_unrebutted_** evidence that Little River appealed only 42 of the 2,174 claims at issue.[17] (June 14 Trial Tr. 707:21-25 (Buchakjian testimony); DTX-462; DTX-463 (United's appeals data).) United's forensic accounting expert, Mr. Buchakjian, actually reviewed the evidence to determine how many claims were appealed (June 13 Trial Tr. 639:2-4), but the Trustee's expert, Mr. Herbers, simply **_assumed_** that all of the claims at issue were appealed—without ever reviewing any evidence that would confirm or deny that assumption. (June 11 Trial Tr. 274:4-13; June 13 Trial Tr. 321:1-4.)

Rather than dispute the fact that the vast majority of the claims at issue were never appealed, the Trustee argues that United waived its argument by allegedly not adequately pleading it in its Answer. (ECF No. 478 at 16-17.) The Court should reject the Trustee's argument. United first raised Little River's failure to appeal claims in a motion to dismiss the Trustee's **_first_** Adversary Complaint nearly **_four years ago_**, in October 2020. (ECF No. 25 at 29 ("[B]efore Little River (or the Trustee standing in Little River's shoes) was able to commence any action related to the alleged underpayment . . . it first had to exhaust all administrative remedies including completing the claims reconsideration and appeals process.").) Yet it was not until the eve of trial that the Trustee first argued United had waived its argument.

---

[17] This figure is based on the claims the Trustee's expert put at issue in his fourth damages opinion, which was contained in a workbook admitted at trial PTX-116.

The Trustee's argument also fails on substance. He is correct that pursuant to Fed. R. Civ. P. 9(c), conditions precedent must be pleaded with particularity—but United *did* plead the Trustee's failure to appeal claims with particularity. In its answer to the operative Adversary Complaint, United (1) denied that Little River had notified United about its claims (ECF No. 328 ¶ 72); (2) raised the affirmative defense that Little River had not complied with conditions precedent (*id.* ¶ 77); and (3) alleged that the Trustee's claims were barred due to failure to exhaust administrative and/or contractual remedies (*id.* ¶ 80). Therefore, United's pleading was more than sufficient to satisfy the requirements of Rule 9(c). *See Myers v. Ctr. Fla. Invs., Inc.*, 592 F.3d 1201, 1224 (11th Cir. 2010) (holding that defendant had fulfilled 9(c)'s requirements by pleading in section of answer titled "affirmative defenses" that "Plaintiff failed to exhaust all administrative remedies and thus cannot obtain relief").

But even if the Court were to conclude that United waived the argument that Little River failed to appeal the claims at issue as required by the Agreement, it should weigh the lack of appeals evidence as confirmation that United was properly adjudicating Little River's claims. Little River knew how to appeal claims it believed were underpaid, had the resources to do so, and aggressively pursued the claims that it believed were not properly adjudicated.[18] The only plausible explanation for the lack of any appeals for the claims at issue is that Little River understood (correctly) that there was nothing to appeal because United had adjudicated the claims properly. (*See* June 10 Trial Tr. 252:19-22 (Studensky).)

---

[18] The Trustee concedes that the "triumvirate" responsible for directing Little River's interactions with insurers would certainly not have left money on the table in the form of underpaid claims. (June 10 Trial Tr. 252:23-254:2.) If any of them had believed United were paying less than it was required to, they certainly would have raised that with United. That they did not is wholly consistent with the fact that the claims were *not* underpaid.

### 4. Little River breached the Agreement by paying kickbacks to physicians.

Finally, even in a world where the Trustee could meet his burden to show, using the necessary medical records, that Little River had performed testing covered by the Agreement— *i.e.*, a claim that was timely submitted, for a covered service, provided by Little River, at a Little River location, to a United member whose benefit plan provided coverage for the lab service at issue—and that Little River had appealed each of the claims the Trustee puts at issue in this case, his causes of action still fail because Little River breached the contract by paying doctors to refer the specimens at issue. The Agreement between Little River and United is unequivocal: ***claims tainted by kickbacks are not payable***. (DTX-3 at 2 (Sections 2.1(vi) and 2.1(iii); DTX-459 at 66.) Little River materially breached the Agreement and Texas law with its conduct, excusing any otherwise allegedly improper claim denials by United (on the remote chance that the Trustee can establish that any of United's reasons for denial were wrong). (June 20 Trial Tr. 1891:1-18, 1892:5-19 (King); 1587:1-4, 1587:18-1588:11, 1591:2-6 (Mancini).)

### i. The undisputed evidence shows that Little River paid kickbacks.

At least two facts are seemingly undisputed on this topic. First, kickbacks are a serious problem in healthcare. And second, Little River paid them to physicians in exchange for referrals. As Mr. King explained, "any reasonable physician or healthcare executive would realize that both the solicitation and the acceptance of kickbacks is potentially illegal and definitely an unacceptable business practice." (June 20 Trial Tr. 1831:20-1832:5) (King).) Kickbacks can "skew the physician's judgment"—"the financial incentives are so strong that the physician doesn't focus on what's best for the patient but, instead, focuses what's in their economic interest." (June 20 Trial Tr 1832:6-18 (King).) Ms. Nelson agreed that kickbacks are "generally frowned upon," and potentially illegal. (June 12 Trial Tr. 206:22-207:2.) Even the Trustee agreed that he would expect

a commercial payor like United to be concerned about providers paying kickbacks in exchange for referrals. (June 10 Trial Tr. 298:15-21.) And that concern makes sense—since kickbacks call into question the medical necessity of services and the rationale for ordering them from a particular provider. (June 20 Trial Tr. 1478:8-1479:9 (Mancini).)

The unrebutted evidence presented at trial shows exactly this phenomenon playing out at Little River. (June 12 Trial Tr. 1886:13-1887:8 (King).) At the direction of corrupt marketers, physicians ordered tests from third-party labs that Little River would bill for. (June 14 Trial Tr. 715:20-717:15 (Buchakjian); 1269:21-1270:14 (Marioni).) The marketers chose Little River to bill for the tests because it "had the best contracts"—it would cut them the biggest check for the referrals. (June 17 Trial Tr. 1237:1-24, 1238:15-18, 1260:9-15 (Marioni).) But the physicians did not actually send their tests to Little River, and sometimes had never even heard of it previously. June 17 Trial Tr. 1270:12-14 (Marioni); 1286:20-22, 1296:1-22 (Salinas); Evans Depo. (ECF No. 519, Ex. A) 78:04-78:16 (Evans invoking Fifth Amendment).) The whole point was for the doctors to get paid. (June 17 Trial Tr., 1294:21-23, 1295:5-11. (Salinas, explaining: "because I was going to make referrals [to Boston Heart], it was going to benefit me"; Evans Depo (ECF No. 519, Ex. A) 104:25-106:10 (Evans invoking Fifth Amendment when asked whether he worked with MSO to receive payments); DTX-232 at 3 (spreadsheet showing MSO distributions).)

Little River paid millions of dollars to these marketers based on the referrals their physicians generated. (DTX-49_0004 (spreadsheet tracking payments to marketers); DTX-48 (spreadsheet tracking physician relationships); Madison Stip. (ECF No. 518) at ¶ 20.) The marketers set up sham "MSOs" to funnel that money back to physician "investors," (June 17 Trial Tr. 1241:19-1242:10 (Marioni); June 14 Trial Tr. 791:12-20 (Buchakjian).), but those MSOs did not provide administrative services. (June 14 Tr. at 776:21-23, 791:12-20 (Buchakjian); June 17

Trial Tr. at 1227:2-5 (Marioni); 1292:20-1293:3 (Salinas).) They were simply a vehicle to distribute the marketers' profits back to the physicians. (June 17 Trial Tr. 1270:2-8 (Marioni); June 14 Trial Tr. 791:12-20 (Buchakjian).) Little River knew that it could not pay doctors for referrals—which is why it went to such lengths to conceal that fact.[19] (*See* June 17 Trial Tr. 1268:6-69:4 (Marioni describing false attestation forms from Little River); ECF No. 518 (Madison Stip.) at ¶ 27-28 (Madison invoking Fifth Amendment regarding same).) But the layers in between Little River and the ordering physicians do not whitewash the impact. United does not pay for claims where the ordering physician profits from the order—regardless of what steps lead up to that payment.

At trial, the Trustee did not seriously dispute the voluminous evidence that Little River paid kickbacks for third-party lab referrals. He did not call a single percipient witness who denied the facts of what Little River did. Even the Trustee's own expert, Ms. Nelson, acknowledged: "I'm not saying that what they did did not violate kickback. [*sic*] Clearly, there is some pretty strong evidence that they did." (June 12 Trial Tr., 227:9-12 (Nelson).) Instead, remarkably, the Trustee attempted to brush aside Little River's scheme as irrelevant. (June 14 Trial Tr. 686:17-24, 714:3-16 (Trustee's running objection).) The Trustee offers a feeble excuse for Little River's abhorrent behavior, arguing that Little River was free to pay for referrals—treating the healthcare system

---

[19] Little River could not conceal it forever. As this Court knows, several Little River executives, along with a variety of doctors, marketers, and employees of Boston Heart and True Health, have faced civil and criminal repercussions for their respective roles in the improper billing and kickback schemes at the heart of this case. *See, e.g.*, Verdict Form, *U.S. v. Hertzberg*, 6:22-cr-3 (E.D. Tex. Nov. 30, 2023), ECF No. 1020 (verdict form for Madison and four others); DTX-2343–DTX-2472 (factual bases and orders adopting guilty pleas for sixteen defendants across various cases). Other criminal proceedings remain ongoing, as the Department of Justice continues to pursue the people involved with Little River's misdeeds. *See U.S. v. Grottenthaler, et al.*, 6:22-cr-135 (E.D. Tex.); *U.S. v. Kash*, 6:22-cr-94 (E.D. Tex.).

like the floor of the Chicago Exchange, where the blood went to the highest bidder. This last-ditch position flies in the face of the law, the Agreement's plain language, and the evidence at trial.

### ii. Claims tainted by kickbacks are not payable.

The Agreement between Little River and United prohibits kickback-tainted claims in two ways. ***First***, the Agreement unambiguously requires Little River to comply with the law. (June 20 Trial Tr. 1587:1-4 (Mancini).) Every single time Little River submitted a claim to United, it made several certifications. By submitting a claim, Little River warranted that all "representations and warranties" set forth in the Agreement were "true and correct as of the date the claim is submitted"—including that Little River's "performance of this Agreement d[id] not and w[ould] not violate or conflict with . . . applicable law." (DTX-3 at 2 (Section 2.1(iii)).) Little River also warranted that it had "complied with the requirements of this Agreement with respect to the Covered Services involved." (DTX-3 at 2 (Section 2.1(vi)).) And it warranted that "the claim is a valid claim." (DTX-3 at 3 (Section 2.1(vi)).)

Claims tainted by kickbacks do not comply with Texas law and are not "valid" claims under the Agreement. (June 20 Trial Tr. 1888:24-1889:5 (King); 1478:8-15 (Mancini).) At trial, the Trustee fixated on the fact that the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), only criminalizes kickbacks for services payable under a federal healthcare program. In doing so, he continues to ignore the Texas Patient Solicitation Act (TPSA), which criminalizes "knowingly" offering or paying "any renumeration" for referrals "for or from a person licensed, certified, or registered by a state health care regulatory agency." Tex. Occ. Code § 102.001(a). The TSPA is squarely on point here; it prohibits kickbacks for referrals to or from licensed healthcare providers,

***including when the services are payable under a commercial plan.***[20] (June 20 Trial Tr. 1890:21-1891:20 (King).) And the evidence at trial was unequivocal—while Little River's employees and co-conspirators were prosecuted under federal law for paying kickbacks on Medicare and Medicare claims, accessing Little River's high reimbursement rates on commercial claims was the whole point of Little River's scheme. *See* DTX-2019 at 2 (email stating that Little River wanted to bill for tests because of its "great contracts"); June 17 Trial Tr. 1237:1-24, 1260:9-15, 1277:2-11 (Marioni); 1298:22-1299:4 (Salinas); Evans Depo. (ECF No. 519, Ex. A) 105:15-106:03 (Evans invoking Fifth Amendment).)

The Trustee's fallback position is that, even if Little River's kickbacks on commercial claims were illegal, the TSPA does not create a private right of action. (ECF No. 478 at 15.) Maybe so, but United is not bringing an action under the TSPA—United is enforcing the terms of ***a private contract that required the parties to comply with applicable law.*** The term "applicable law" is not ambiguous—"applicable," when used to describe a law, means "affecting or relating to a particular person, group, or situation; having direct relevance." *Applicable*, Black's Law Dictionary (12th ed. 2024). Even the Trustee's own expert, Ms. Nelson, agreed that when payors want to prevent kickbacks: "you put that in your representations and warranties, that, you know, ***a provider will***

---

[20] The Trustee's expert, Ms. Nelson, attempted to testify—in what this Court rightly rejected on the spot as an improper legal opinion, "as if she was counsel talking from the lectern" (June 12 Trial Tr., 83:9-20)—that the TSPA "does not apply to licensed health insurers or HMOs" (June 12 Trial Tr. 79:25-80:2.) This misguided view of the law deserves no credence. While Tex. Occ. Code § 102.005 indeed excludes insurers and HMOs from the TSPA, this section merely means that an insurer or HMO cannot ***violate*** the act. Nothing in the statute says that a ***physician*** whose patient's care is paid for by an insurer or HMO is exempt from the act. To the extent this Court is inclined to consider any expert opinion regarding this unambiguous statute, it should consider that of Mr. King, who testified that based on his industry experience for both providers (like Little River) and insurers (like United) in Texas, he was "well aware" that the Act applies to physicians who submit claims to commercial insurers. (June 20 Trial Tr. 1889:10-1890:20 (King).)

*comply with all laws*, including but not limited to – and there *may* be a laundry list of law and including kickbacks." (June 12 Trial Tr. 84:9-19 (emphasis added).) Because the TSPA applies to Little River—the party required to comply with the law in performing and billing healthcare services under the Agreement—it is an "applicable law" that Little River must follow.

      *Second,* United's Administrative Guides also made clear that kickback-tainted claims did not comply with the Agreement and were not valid claims, stating: "[r]eferrals for laboratory services that results in the physician earning a profit . . . are not allowed." ((DTX-459 at 66; 1591:2-6 (Mancini); 1918:18-1919:19 (King).) The Trustee mistakenly claims this provision only applies to "physicians and health care professionals." (ECF No. 478 at 14.) But this argument willfully ignores the second half of the same sentence in the Administrative Guides: "This protocol applies to all participating physicians and health care professionals, *and it applies to all laboratory services, clinical and anatomic, ordered by physicians and health care professionals*." (DTX 459 at 66; June 20 Trial Tr. at 1590:14-20 (Mancini).) There is no factual dispute in this case that physicians ordered the lab services at issue. Thus, there should be no dispute that this provision of the Administrative Guide applies to the resulting lab services.[21] (June 13 Trial Tr. 532:3-8 (Martino).)

---

[21] The Trustee also argues that the Administrative Guide's prohibition on kickbacks is irrelevant to this case because the Guide states that "failure to comply with [the kickback provision] may result in: a decreased fee schedule; or termination of network participation." (DTX-459 at 66 (emphasis added).) According to the Trustee, this language means that there are only two, mutually exclusive remedies United may pursue in response to a provider paying kickbacks, and because here, United opted to decrease Little River's fee schedule (by way of the 2017 Amendment to the Agreement), it could not also deny claims that were tainted by kickbacks. (ECF No. 478 (Trustee's Pre-trial Brief) at 16.) The Trustee's argument is absurd. First, nowhere in the Guide (or the Agreement) does it state that there are only two, mutually exclusive remedies for kickback-tainted claims. Second, and more importantly, the Trustee ignores the obvious: ███████████████████████████████████ and there is no dispute that the Administrative Guide's prohibition on kickbacks is such a protocol. (DTX-459 at 66 ("This

In sum, every time Little River paid providers to order laboratory testing, it violated both federal and state law and United's Protocols. And every time it submitted a claim to United for those services, it breached the Agreement by misrepresenting that it was performing in accordance with those laws and Protocols. Little River's kickback-tainted laboratory testing claims, in other words, were not "true and correct." (DTX-3 at 2 (Section 2.1(vi).) Nor were they "valid claim[s]." (*Id.*)[22] The claims are not payable.

### C.  Because the Trustee cannot establish breach, his statutory claims fail.

In addition to his failure to prove his breach of contract claims, the Trustee has not proven his statutory claims for violations of the Texas Prompt Pay Act ("TPPA"), Tex. Ins. Code §§ 843.336 *et seq.* and 1301.101 *et seq.* (2d Am. Adv. Compl. Count III (ECF No. 325)), and the Unfair Claim Settlement Practices Act ("UCSPA"), Tex. Ins. Code § 542.058 (*id*. Count IV).

At trial, Mr. Herbers admitted that a "precondition for [his] calculation of damages under the Texas Prompt Pay [Act] was that [Little River] had first been underpaid by United." (June 11 Trial Tr. 85:20-23.) In other words, no claim is subject to TPPA damages unless it was either denied entirely or not paid in full by United. (June 11 Trial Tr. 85:24-86:4.) As explained above, the Trustee offered ***no evidence*** at trial to show that United improperly denied or underpaid ***any*** claim, so his request for TPPA damages also fails.

---

*protocol* applies . . . "); June 13 Trial Tr. 532:3-534:17 (Martino); June 20 Trial Tr. 1919:20-24 (King).)

[22] In fact, in the context of the federal False Claims Act, courts have explained that "[c]laims resulting from kickbacks are 'false'"—"[b]ecause the government would not knowingly reimburse kickback-tainted claims." *United States ex rel. Everest Principals, LLC v. Abbott Lab'ys, Inc.*, 622 F. Supp. 3d 920, 930 (S.D. Cal. 2022) (citation omitted); see 42 U.S.C. § 1320a-7b(g) (providing that a kickback-tainted claim "constitutes a false or fraudulent claim" under the False Claims Act). While the False Claims Act does not apply to this commercial dispute between Little River and United, the plain language of the Agreement makes equally clear that United would not pay such claims here.

The Trustee also cannot recover on his UCSPA claim. Despite alleging that he has standing to pursue that claim based on an assignment of United members' rights (2d. Am. Compl. ¶ 54), standing under the UCSPA *cannot be assigned*: "the Texas Supreme Court has . . . ruled that third parties do not have standing to sue for unfair claim-settlement practices" and such claims "may not be assigned to third parties." *Angelina Emergency Med. Assocs. PA v. Health Care Serv. Corp.*, 506 F. Supp. 3d 425, 436-37 and n.48 (N.D. Tex. 2020) (citing *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 82 (Tex. 2004); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 384 (Tex. 2000); *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 150 (Tex. 1994)) (dismissing UCSPA claim brought by groups of physicians against insurance companies which alleged that physicians were underpaid for services provided to companies' members); *see also Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc.*, 620 S.W.3d 458, 468–69 (Tex. App. 2021) (holding that "the overwhelming weight of persuasive authority holds that claims under chapter 541 of the Texas Insurance Code may not be assigned" and dismissing UCSPA claim brought by physicians against insurer), *aff'd*, 659 S.W.3d 424 (Tex. 2023).

Moreover, even if the Trustee could pursue an UCSPA claim based on an assignment of benefits, he offered *not one shred of evidence* at trial to prove that any assignment ever occurred. It is the Trustee's burden to prove standing to pursue his claims, *see Smith v. Moss L. Firm, P.C.*, No. 3:18-CV-2449-D, 2019 WL 201839, at *2 (N.D. Tex. Jan. 15, 2019) (recognizing claimant bears burden to prove statutory standing), and once again, he has failed to meet that burden.

### D.    The Trustee has failed to rebut the prima facie case in United's proofs of claim.

Not only has the Trustee failed to establish his adversary claims by a preponderance of the evidence, he also failed to overcome United's prima facie showing on its proofs of claim. "Under Rule 3001(f) of the Federal Rules of Bankruptcy Procedure, a party correctly filing a proof of

claim is deemed to have established a prima facie case." *In re Palms At Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005) (citing *Matter of Fid. Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). "The claimant will prevail **unless** the objecting party produces evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Leverett*, 378 B.R. 793, 799 (Bankr. E.D. Tex. 2007) (emphasis added). ***Only if the Trustee comes forth with such evidence*** does the burden of proof fall back on United to introduce additional evidence of its claims—but the Trustee has not done so. *Id.*

United's proofs of claim set forth a prima facie case of three claims. *See In re Little River Healthcare Holdings*, Proof of Claim No. 398 ("POC 398"); *In re Rockdale Blackhawk, LLC*, Proof of Claim No. 466 ("POC 466"). First, the proofs of claim assert that Little River breached the Agreement by improperly representing that the claims it submitted were valid claims, submitting claims for services that were not performed at Little River facilities or for Little River patients, failing to collect cost sharing obligations from United Members, improperly assigning the Agreement to True Health, and violating the Agreement's confidentiality provisions. (POCs 398 and 466 at 7-8.) Second, they assert that Little River tortiously interfered with United's contracts by routinely waiving or capping member payment obligations. (*Id.* at 8.) Third, the proofs of claim assert that Little River fraudulently and negligently misrepresented the facts of its fraudulent billing scheme from United. (*Id.* at 8.) Little River's conduct caused United to pay numerous claims for laboratory services that it should not have had to pay under the Agreement, damaging United in the amount of $39,418,692.14. (*Id.* at 2, 4, 7, 9.)

The claims at issue in United's proofs of claim are different from the ones at issue in the Trustee's adversary claims. As set forth above, the Trustee's breach-of-contract cause of action is

based on claims that United paid at less than ████████████ for a host of valid reasons—

*e.g.*, because the claim was not timely filed or the patient was not a United member. United's

proofs of claim, on the other hand, are based on claims that United actually did pay, but should not

have because of Little River's breaches. As Ms. Mancini explained at trial, United identified those

claims by identifying all the laboratory claims in Little River's claims data provided to members

who were further than 50 miles from Little River—a conservative threshold given the location of

other healthcare providers in the area. (June 20 Trial Tr. 1561:7-1562:2.)

But while the set of claims at issue are different, the same facts about Little River's billing

and kickback scheme apply to both the adversary proceeding and the proofs of claim.[23] Notably,

as set forth above, the Trustee did not earnestly dispute the evidence of Little River's billing

scheme and kickbacks at trial. The Trustee cannot and does not deny that Little River submitted

numerous claims for laboratory testing performed by Boston Heart and True Health, or that Little

River paid kickbacks to physicians on numerous claims it submitted to United. He did not submit

a shred of evidence refuting that any one of the claims comprising United's proofs of claims was

tainted by kickbacks and billing for services that Little River did not perform.

Instead, the Trustee's argument on these issues is purely contractual; he argues that Little

River was allowed to bill for services it did not perform, and that Little River's kickbacks are

***irrelevant***. (*See* ECF No. 478 at 10-16.) For the same reasons set forth in detail above, those

arguments also fail here.[24] Accordingly, the Trustee has not produced "evidence at least equal in

---

[23] While the adversary claims and proofs of claim overlap in this one respect, the Trustee's adversary claims could be resolved in favor of United based on the Trustee's lack of evidence of breach—without ever reaching the issues of Little River's improper billing or kickbacks. Thus, as United has set forth extensively in other briefing (and as currently pending before the District Court on interlocutory appeal), a jury trial is mandatory on the adversary claims.

[24] The Trustee's counsel asserted at trial that United's proofs of claim do not put kickbacks at issue. (June 14 Trial Tr. at 686:25-687:19.) But the proofs of claim are based off of Little

---

probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Leverett*, 378 B.R. at 799. United must therefore prevail on its proofs of claim.

Even in the event this Court determines United must shoulder the burden of proof on its proofs of claim, it has no doubt done so. Based on the same facts set forth above, United established by a preponderance of the evidence at trial that Little River materially breached the Agreement by billing for services it did not perform and paying kickbacks to physicians. Those actions were material breaches of the Agreement, rendering Little River's affected laboratory testing claims not payable. In short, whichever party ultimately carries the burden of proof on United's proof of claim, this Court should award United the nearly $40 million in damages set forth in the proofs of claims.

Finally, as Mr. Buchakjian explained, the Trustee's damages witness, Mr. Herbers, "has under his methodology taken the position that overpayments by United should offset any claims owed by United to Little River." (June 20 Tr. 862:21-863:8 (Buchakjian).) While United maintains that it owes no damages in this case, to the extent this Court finds otherwise based on Mr. Herbers's methodology, it should consistently apply that methodology and reduce those damages against the damages owed to United on its proofs of claim.

## V.    CONCLUSION

Because the Trustee has not come forth with any evidence showing that Little River performed its obligations in accordance with the Agreement, that any single claim Little River submitted was actually payable, or that United breached the Agreement by paying a claim at less

---

River's improper billing scheme—and, as described at trial by Mr. Buchakjian, Ms. Mancini, and other witnesses, kickbacks were a core component of that scheme.

than what should have been paid under the terms of the Agreement and the member's applicable benefit plan, and in light of the numerous reasons explained above as to why the Trustee's case fails on the merits, the Court should enter judgment in United's favor on each of the Trustee's claims and allow United's proofs of claim.

Dated: July 26, 2024          By:    _/s/ Marcus A. Guith_

**ROBINS KAPLAN LLP**
Munir R. Meghjee (Admitted PHV)
Jeffrey S. Gleason (Admitted PHV)
Jamie R. Kurtz (Admitted PHV)
John K. Harting (Admitted PHV)
Marcus A. Guith (Admitted PHV)
Kyle D. Nelson (Admitted PHV)
Erica D. Rosenbaum (Admitted PHV)
Brent A. Murcia (Admitted PHV)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
T: (612) 349-8500
F: (612) 339-4181
mmeghjee@robinskaplan.com
jgleason@robinskaplan.com
jkurtz@robinskplan.com
jharting@robinskaplan.com
mguith@robinskaplan.com
knelson@robinskaplan.com
erosenbaum@robinskaplan.com
bmurcia@robinskaplan.com

- and –

**SHIPMAN & GOODWIN LLP**
Eric S. Goldstein (admitted PHV)
One Constitution Plaza
Hartford, CT 06103
T: (860) 251-5000
F: (860) 251-5099
egoldstein@goodwin.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2024, the foregoing was filed electronically with the United States Bankruptcy Court for the Western District of Texas through the Court's CM/ECF system, and was sent to counsel for the plaintiff by email or via electronic notice through the Court's CM/ECF System, as set forth below:

<u>VIA CM/ECF</u>
Brian T. Cumings
Matt Powers
William Christian
Marianne Nitsch
GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, TX 78701
bcumings@gdhm.com
mpowers@gdhm.com
wchristian@gdhm.com
mnitsch@gdhm.com

<u>VIA CM/ECF</u>
Lynn Hamilton Butler
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701

<u>VIA CM/ECF</u>
Katherine Battaia Clark
Thompson Coburn LLP
2100 Ross Avenue, Suite 3200
Dallas, TX 75201
kclark@thompsoncoburn.com

<u>VIA CM/ECF</u>
Tamara D. Baggett
Jimmy D. Parrish
Baker & Hostetler LLP
2850 North Harwood Street, Suite 1100
Dallas, Texas 75201

<u>VIA CM/ECF</u>
Michael Fishel
Sidley Austin LLP
1000 Louisiana, Suite 6000
Houston, TX 77002

/s/ *Marcus A. Guith*