## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| Little River Healthcare Holdings, LLC *et al.*, | Case No. |
| Debtors. | 18-60526-rbk |
| | (Jointly Administered) |
| James Studensky, Chapter 7 Trustee for Little River Healthcare Holdings, LLC *et al.*, | Adversarial Proceeding No. |
| Plaintiff, | |
| v. | 20-AP-06093 |
| UnitedHealthcare Insurance Company, *et al.*, | |
| Defendants. | |

## UNITED'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants UnitedHealthcare Insurance Company; United Healthcare of Texas, Inc.; UnitedHealthcare Benefits of Texas, Inc.; and UnitedHealthcare Community Plan of Texas, LLC (collectively, "United") propose that the Court find and conclude:

## I.    Parties and Procedural History

1.    Before it closed in 2018, Little River Healthcare Holdings, LLC, et al. (collectively, "Little River") owned and operated a small rural hospital in Rockdale, Texas.

2.    Defendants UnitedHealthcare Insurance Company; United Healthcare of Texas, Inc.; UnitedHealthcare Benefits of Texas, Inc.; and UnitedHealthcare Community Plan of Texas, LLC (collectively, "United") are in the business of providing health insurance and health insurance-related services, including the administration of employer-based self-funded ("ASO") plans, fully insured plans, Medicare Advantage plans, and Medicaid plans.

3.    Effective October 1, 2014, Little River and United entered into a Facility Participation Agreement (the "Agreement") to "make [Little River's] services available to [United's] Customers" as an in-network provider. (DTX-03 at 1.)

4.    Between October 2014 and its closing, Little River submitted to United claims for payment for, among other things, laboratory services. United paid Little River more than $39 million for those laboratory services claims. (June 14 Trial Tr. at 585:20-23 (Buchakjian).)

5.    On July 24, 2018, Little River filed for Chapter 11 bankruptcy. On December 7, 2018, the proceeding was converted to a Chapter 7 proceeding. James Studensky ("the Trustee") was appointed Trustee of the Chapter 7 estate.

6.    United filed two proofs of claim against the bankruptcy estate on October 30, 2018. *See In re Little River Healthcare Holdings*, Proof of Claim No. 398 ("POC 398"); *In re Rockdale Blackhawk, LLC*, Proof of Claim No. 466 ("POC 466"). In the proofs of claim, United alleges that

Little River breached the Agreement, tortiously interfered with United's contracts, and defrauded United into paying numerous insurance claims for laboratory services that were not, in fact, payable under the Agreement.

7. The Trustee filed an adversary complaint against United on August 24, 2020. (ECF No. 001). The Trustee has amended his adversary complaint several times, dismissing several causes of action. At the time of trial, the operative complaint was the Trustee's Second Amended Adversary Complaint (ECF No. 325). In that Complaint, the Trustee alleged five counts against United: (1) Breach of Contract; (2) Improper Recoupment; (3) Violation of the Texas Prompt Pay Statutes; (4) Violation of the Texas Unfair Claim Settlement Practices Act; and (5) Declaratory Judgment. The Trustee dropped his Improper Recoupment claim prior to trial. (June 10 Trial Tr. 33:22-34:2.) The Trustee's remaining claims are based on his allegation that United did not pay (or underpaid) Little River for certain insurance claims that the Trustee alleges United should have paid under the parties' Agreement.

8. This order follows a bench trial on the Trustee's remaining claims (Breach of Contract; Violation of the Texas Prompt Pay Statutes; Violation of the Texas Unfair Claim Settlement Practices Act; and Declaratory Judgment) and United's proofs of claim.

## II. Findings of Fact

### A. The Agreement between Little River and United set out the terms under which United would adjudicate and pay claims.

9. The Agreement had an effective date of October 1, 2014. (DTX-03 at 1.)

10. The Agreement was amended effective October 1, 2017. (PTX-65 at 1.) The only change in that amendment that is relevant to the issues before the Court is the rate at which United agreed to pay for lab services covered by the Agreement.

11.     The purpose of the Agreement was for United "to make [Little River's] services available to [United's] Customers," and for Little River "to provide such services, under the terms and conditions set forth in [the] Agreement." (DTX-03 at 1.)

12.     The Agreement stated that it was limited to "Covered Services," which were defined as "health care service[s] or product[s] for which a Customer is entitled to receive coverage from a Payer, pursuant to the terms of the Customer's Benefit Plan with that Payer." (DTX-03 at 1 (Section 1.2).)

13.     In addition, the Agreement was limited to services provided to a United "Customer," defined as a "a person eligible and enrolled to receive coverage from a payer for Covered Services." (DTX-03 at 1 (Section 1.4).)

14.     At all times relevant to these proceedings, United offered commercial plans that were not covered by the Agreement—including narrow-network plans, individual plans offered over the health insurance Exchange, as well as plans that were issued in states other than Texas. (DTX-03 at 22 (Appendix 2); June 13 Trial Tr. 505:17-24 (Martino); DTX-1005.)

15.     The Agreement applied only to ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

16.     The Agreement also stated that ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████

17.     The Agreement also further limited who can receive the benefits of the Agreement. It stated that "[t]his Agreement may not be assigned by either party without the written consent of the other party, except that this Agreement may be assigned by United to any of United's Affiliates." (DTX-03 at 15 (Section 9.4).)

18.     The Agreement also prohibited third-party beneficiaries, stating, "United and [Little River] are the only entities with rights and remedies under the Agreement." (DTX-03 at 15 (Section 9.6).)

19.     The Agreement allows for ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████

20.     The Agreement required that █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████

21.     The Agreement also required Little River to comply with the law in performing, and billing, the services at issue: "The execution, delivery and performance of this Agreement by [Little River] do not and will not violate or conflict with . . . applicable law." (DTX-03 at 2 (Section 2.1(iii)).)

22.     The Agreement also required that Little River "cooperate with and be bound by United's and Payers' Protocols." (DTX-03 at 5 (Section 4.4).) The Agreement defined Protocols as "the programs and administrative procedures adopted by United or a Payer to be followed by Facility in providing services and doing business with United and Payers under this Agreement." (DTX-03 at 2 (Section 1.7).) The Agreement also stated that "[s]ome or all Protocols may be disseminated in the form of an administrative manual or guide or in other communications. . . . United may implement changes in the Protocols without Facility's consent if such change is applicable to all or substantially all of the facilities in United's network located in the same state as Facility." (DTX-03 at 5-6 (Section 4.4).)

23.     In the Agreement, Little River also represented and warranted that Little River "has been given an opportunity to review the Protocols and Payment Policies." (DTX-03 at 2 (Section 2.1(v)).)

24.     One such Protocol published by United was its Administrative Guide, which United generally updates annually. The provisions of the Guide discussed herein were substantially similar during all relevant years; for ease of reference, the 2016 Administrative Guide is referenced herein. (DTX-459.)

25.     United's Administrative Guide is made available to all of its participating providers, including Little River, at the time of contracting, as well as throughout the contractual relationship via United's online provider portal. (June 13 Trial Tr. 523:11-21, 515:8-10, 517:4-19, 525:3-22 (Martino).)

26.     It is standard within the healthcare industry for payors to incorporate policies and administrative guides into their agreements with providers and to make those policies and

administrative guides available online. (June 20 Trial Tr. 1892:23-1893:11, 1900:9-1901:3 (King); June 12 Trial Tr. 200:10-15 (Nelson).)[1]

27.     The Agreement, including United's Administrative Guide, described the process for appealing any claims where Little River disagreed with United's adjudication of any claim. (DTX-03 at 10 (Section 6.5); DTX-459 at 82-84.)

28.     United's Administrative Guide required that providers must complete this appeal process **before** proceeding to outside dispute resolution. (DTX-459 at 84.)

29.     United's Administrative Guide also stated that "[r]eferrals for laboratory services that results in the physician earning a profit . . . are not allowed." (DTX-459 at 66.)

30.     The Agreement incorporated an All-Payer Appendix, a Medicare Advantage Payment Appendix, and a Medicaid Payment Appendix, which set forth the rates that United agreed to pay and Little River agreed to accept for services performed by Little River that are otherwise covered under the Agreement. (DTX-03 at 26-57, 76-87, 58-75.) The All-Payer Appendix applies to "Covered Services **rendered by [Little River]** . . . ." (*Id*. at 29 (Section 2.1 of All-Payer Appendix; emphasis added).)

31.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

---

[1] United has renewed its *Daubert* motions to exclude the testimony of Ms. Nelson (cited here) and Mr. Herbers (cited below) in its entirety. In the alternative, should the Court deny those motions, these proposed findings explain why United prevails despite those witnesses' testimony.

32.    The Agreement contained a confidentiality provision which states that "[n]either party will disclose to a Customer, other health care providers, or other third parties any of the following information (except as required by an agency of the government): . . . ii) the specific reimbursement amounts provided for under this Agreement, except for purposes of administration of benefits." (DTX-03 at 15 (Section 9.9(ii).)

33.    If a claim submitted by Little River is not payable for some reason— ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████ —the Agreement allows United to deny payment in whole or in part for that claim. (DTX-03 at 10-11 (Section 6.5, 6.6).)

34.    The Agreement permitted United to audit Little River's performance under the Agreement and its compliance with the same, and it required Little River to maintain all medical, administrative, and financial records relevant to claims submitted to United for a period of at least six (6) years. (DTX-03 at 7 (Section 4.10).)

**B.    United adjudicated the claims at issue in accordance with the Agreement.**

35.    By submitting each claim under the Agreement, Little River identified itself as the entity that performed the laboratory testing, ████████████████████████████

██████████████████████████████, certified that it had complied with the Agreement's requirements and all applicable laws, and certified that the claim was "valid." (*See* DTX-03 at 2-3 (Sections 2.1(vi) and (iii)).)

36.    For each of the claims at issue, Little River submitted a request for payment using the electronic version of a UB-04 form. The back of the UB-04 form states that "[s]ubmission of

this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete [and] that the submitter did not knowingly or recklessly disregard or misrepresent material facts." The form also states that "the submitter of this form understands that misrepresentation or falsification of essential information as requested by this form[] may serve as the basis for civil [or criminal] . . . penalties." (June 17 Trial Tr. 1085:4-19, 1087:9-1088:2 (Smith); PTX-78.)

37.     United adjudicated each of the claims at issue consistent with the terms of the Agreement. As part of that process, United evaluated whether the claim was payable, and at what rate—considering, for example, whether the claim was for a service provided to a member enrolled in a plan covered by the Agreement, whether the service was covered by the member's plan, what the contractual "allowed amount" for the claim was, and whether patient cost-share responsibility (deductible, co-insurance, or co-pay) applied. (June 17 Trial Tr. 1073:5-20, 1074:6-1075:1, 1077:2-7, 1077:12-1078:2 (Smith).)

38.     Where United needed additional information to adjudicate a claim, it notified Little River of that fact. (June 13 Trial Tr. 536:18-24 (Martino); June 17 Trial Tr. 1116:9-14 (Smith).) While United's request for information was outstanding, United pended the claim. (June 17 Trial Tr. 1116:9-14 (Smith).) If Little River failed to provide such necessary information, United denied the claim. (June 17 Trial Tr. 1117:17-1118:1 (Smith).) Otherwise, once Little River had provided all required information, United completed the adjudication of the claim. (June 17 Trial Tr. 1117:9-16 (Smith).)

39.     United relied on the accuracy of each of Little River's representations in adjudicating the claims it received from Little River. (June 13 Trial Tr. 481:19-22 (Martino).) If

United knew that any of those representations were false or misleading, United would not have paid the claim. (DTX-03 at 2 (Section 2.1(vi)).)

40.    At trial, the Trustee contended that United had underpaid a subset of the claims Little River billed between 2016 and 2018 for laboratory testing. (June 10 Trial Tr. 34:8-10, 84:19-20 (Trustee's opening).)

41.    The only evidence the Trustee presented at trial related to the claims he put at issue was United's claims data (PTX-86), along with the testimony and work product of his purported expert, Mark Herbers, who attempted to interpret that United data. (PTX-116; *see generally* June 11 Trial Tr., June 13 Trial Tr. 252:1-329:25 (Herbers).)

42.    Mr. Herbers did not evaluate any records—separate from the claims data—supporting any of the lab claims allegedly at issue. Instead, his analysis and testimony was based solely on United's claims data. (June 11 Trial Tr. 92:21-93:3, 109:3-112:2, 286:22-288:24 (Herbers).)

43.    United's claims data shows what Little River billed for and the reason United provided for paying the claim as United did. (June 13 Trial Tr. 587:1-6; *see also id.* at 590:8-598:19 (Buchakjian).) United's claims data is not evidence of whether Little River was actually owed anything under the contract—i.e., whether the hospital had performed services in compliance with its contractual obligation. (June 20 Trial Tr. 1877:5-20 (King).) The Trustee did not offer any evidence of a single medical record, laboratory requisition form, test result, patient consent or registration form, or United Customer Benefit Plan that related to any of the specific lab claims he put at issue via Mr. Herbers' purported damages analysis.

44.    The United data offered at trial shows that each of the lab claims that the Trustee put at issue was adjudicated with one of the following reasons (PTX-86; PTX-116):

a.   Service not covered;

b.   Not timely filed;

c.   Missing necessary supporting information;

d.   Subject to other insurance coverage;

e.   Paid for as part of a bundled claim;

f.   Duplicate claim;

g.   Claim reprocessed;

h.   Plan not covered by Agreement; and

i.   Service not performed by Little River.

45.     The Trustee did not present any evidence that any of these reasons was inaccurate as to any particular lab claim put at issue by Mr. Herbers—*e.g.*, that any of the specific claims at issue were for Covered Services (*i.e.*, pursuant to a United Customer Benefit Plan) or timely filed.

**C.     Little River billed for lab tests that it did not, and could not, perform.**

46.     The Trustee did not offer any evidence that any of the claims he has put at issue were payable—in other words, he has not shown, *e.g.*, that the patient who received the testing was a member of a United plan, that the testing was covered by the member's benefit plan, that the testing performed was medically necessary, and so on. In particular, the Trustee did not offer any evidence that any of the tests was performed ███████████████████████████ ██████████████████████ .

47.     Instead, the evidence United offered at trial showed that the tests underlying the at-issue claims were primarily comprised of proprietary advanced lipid testing that could only be performed by either Boston Heart Diagnostics Corp. ("Boston Heart") or True Health Diagnostics, LLC ("True Health") at their laboratories in Massachusetts and Virginia. (June 18 Trial Tr.

1427:22-1431:10 (Blum); June 14 Trial Tr. 1024:2-8 (Sheinberg); *see also* June 10 Trial Tr. 49:10-16 (Trustee's opening statement) ("in many instances there were particular proprietary tests where really to get that exact test done, there was nobody else who could do it other than, for instance, a Boston Heart"); June 17 Trial Tr. 1251:13-1252:8 (Marioni), 1284:7-16 (Salinas); DTX-06; DTX-31.) ███████████████████████ does not include any locations in Massachusetts or Virginia. (DTX-03 at 19-21.) Nor is there evidence of any subsequent written agreement to add one of these locations to the Agreement.

48.     The Trustee suggested that, at some point, some lab tests may have been performed at a lab run by OMS (d/b/a True Health) located at Little River. But the Trustee did not offer any evidence that any one of the claims he has put at issue (*i.e.*, the claims included in Mr. Herbers' final damages analysis) were for testing performed at the OMS lab. Nor could he, as the Trustee testified that he stopped paying Little River's vendors and thereby destroyed access to relevant data and documents after filing this action. (June 10 Trial Tr. 230:25-231:13, 234:16-21.) Consequently, the Court cannot assume any test was performed at the OMS lab, as the OMS lab was only operational for a portion of the time frame at issue and never had the capabilities to run all of the tests ordered. (June 18 Trial Tr. 1425:16-1426:4, 1433:6-14, 1420:1-1421:1, 1427:22-1431:10 (Blum).).

49.     The Agreements between Little River and Boston Heart and True Health respectively stated that they were independent contractors of Little River. (DTX-06 at 2 (Section 1.11); DTX-31 at 3 ¶ 15; *see also* June 20 Trial Tr. 1849:7-1852:5 (King).)

**D.     Little River did not appeal United's claim adjudications.**

50.     The Trustee did not offer any evidence that Little River appealed United's adjudication of any of the at-issue claims before (or after) the Trustee initiated this suit.

51.      United offered evidence that Little River only appealed United's adjudication of 42 of the thousands of claims the Trustee has put at issue. (June 14 Trial Tr. 707:21-25 (Buchakjian); DTX-462; DTX-463.)

**E.      Little River billed for lab tests that were induced by Little River's payment of kickbacks to physicians.**

52.      Little River paid physicians kickbacks in order to induce referrals for laboratory testing that was performed by Boston Heart and True Health but billed by Little River. Little River paid these kickbacks through a multi-step process involving multiple entities.

53.      In fact, Little River's own expert admitted kickbacks took place. (June 12 Trial Tr. 227:8-12 (Nelson).).

54.      First, Little River entered into third-party marketing agreements to "incentiviz[e] physicians to refer these labs to these laboratories that . . . Little River [could] then bill to United." (June 14 Trial Tr. 775:15-21, 778:9-790:13 (Buchakjian); DTX-379, DTX-38, DTX-665 (marketing agreements).) The purpose of these relationships was "to engage these marketers to go out and recruit physicians and physician practices to refer laboratories to the third-party labs . . . so that Little River [could] then pass through bill those bills to United." (June 14 Trial Tr. 790:14-25 (Buchakjian).; *see also* June 20 Trial Tr. 1886:13-1887:8 (King).)

55.      Little River paid these third-party marketers a percentage of net collections for laboratory referrals generated by the doctors with whom the marketers had relationships. (DTX-379, DTX-38, DTX-665 (marketing agreements); DTX-21, DTX-49 (spreadsheets tracking payments to marketers); DTX-48 (spreadsheet tracking physician relationships); June 14 Trial Tr., 778:9-790:13 (Buchakjian).)

56.      Second, the third-party marketers retained by Little River created "MSOs"—management service organizations—to pay the physicians who they recruited to bill tests through

Little River. (June 14 Trial Tr. 791:12-20 (Buchakjian).) The marketers would pitch the physicians on an opportunity to "invest" in the MSO. (June 17 Trial Tr. 1241:19-25 (Marioni); 1292:12-19 (Salinas); DTX-295 (Ascend MSO offering memorandum).) And after they did so, the physicians would receive compensation for their referrals in the form of a "dividend." (June 14 Trial Tr. 806:23-807:17 (Buchakjian); DTX-232 (spreadsheet showing Ascend MSO distributions).) The purpose of this dividend was nothing more than to "pay out the physicians" who contributed referrals to Little River's pass-through billing scheme. (June 17 Trial Tr. 1270:2-8 (Marioni).)

57.     Once physicians became affiliated with a Little River-driven MSO, "[t]hey began to order tests . . . to third-party laboratories that were billed by Little River to United." (June 14 Trial Tr. 858:9-860:16 (Buchakjian).) One of these physicians, Dr. Heriberto Salinas, testified at trial that he understood that "I was going to refer blood work" to be performed by Boston Heart and billed by Little River, and "I was going to get paid." (June 17 Trial Tr. 1293:7-11; 1296:1-1297:5.) Another physician, Dr. Charles Evans, invoked the Fifth Amendment in response to nearly every question asked of him, including questions about his alleged receipt of kickbacks in exchange for referring testing to True Health that Little River billed for. (ECF No. 519, Ex. A 105:06-109:17 (Evans Depo).) The Court draws an adverse inference against the Trustee based on Dr. Evans's invocation of the Fifth Amendment here. *See F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 45 F.3d 969, 977 (5th Cir. 1995) (adverse inference permissible based on non-party witness's invocation of Fifth Amendment).

58.     Little River's CEO, Mr. Madison, invoked the Fifth Amendment when asked about every step of this scheme. For instance, Mr. Madison would not answer whether he knew that Little River paid marketers based on the volume of tests their affiliated physicians referred (Madison Stip. (ECF No. 518) ¶¶ 20-21); whether he knew that those marketers were affiliated with MSOs

(*id.*at ¶ 22); or whether he knew that those MSOs were ultimately paying kickbacks to physicians (*id.* at ¶ 23). However, Mr. Madison is awaiting sentencing after a federal jury found him guilty of conspiracy to commit illegal remunerations based on this conduct. (*See* Verdict Form, *U.S. v. Hertzberg*, 6:22-CR-3-JDK (E.D. Tex.), ECF No. 1020 (indicating Mr. Madison was found guilty); DTX-56 at 15 (*U.S. v. Hertzberg* Indictment).)[2] The Court also draws an adverse inference against the Trustee based on Mr. Madison's invocation of the Fifth Amendment here. *See F.D.I.C.*, 45 F.3d at 977.

59.     Little River did not only pay kickbacks on the Medicare and Medicaid claims that led to Mr. Madison's prosecution. Little River also paid physicians kickbacks on the claims that it billed to United and other commercial payors. (June 17 Trial Tr. at 1240:11-23 (Marioni); 1298:22-1299:4 (Salinas); Madison Stip. (ECF No. 518) ¶ 20.) In fact, the record indicates that the favorable reimbursement rates in Little River's commercial contracts were a primary motivator of Little River's conduct. (*See* DTX-2019 at 2 (email stating that Little River wanted to bill for tests because of its "great contracts"); June 17 Trial Tr. 1237:1-24, 1260:9-15 (Marioni); 1298:22-1299:4 (Salinas); Evans Depo. (ECF No. 519, Ex. A) 105:15-106:03 (Evans invoking Fifth Amendment).)

## III. CONCLUSIONS OF LAW

### A.     Trustee's Breach-of-Contract Claim

60.     Under Texas law, to succeed on his breach-of-contract claim, the Trustee must prove by a preponderance of the evidence that "there was a (1) valid contract (2) where [Little River]

---

[2] Several other Little River employees, along with a variety of doctors, marketers, and employees of Boston Heart and True Health, have faced civil and criminal repercussions for their respective roles in this kickback scheme. *See, e.g.,* Verdict Form, *Hertzberg*, 6:22-cr-3 (E.D. Tex.) (verdict form for Madison and four others); DTX-2343–DTX-2372 (factual bases and orders adopting guilty pleas for sixteen defendants across various cases). Other criminal proceedings remain ongoing. *See U.S. v. Grottenthaler, et al.*, 6:22-cr-135 (E.D. Tex.); *U.S. v. Kash*, 6:22-cr-94 (E.D. Tex.).

performed, (3) but [United] breached, (4) and that breach damaged [Little River]." *Hill v. Concho Res., Inc.* 634 F. Supp. 3d 359, 363 (W.D. Tex. 2022); *Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 733-34 (Tex. Ct. App. 2010).

61.     The Trustee has not carried his burden in establishing the elements of his breach of contract claim.

62.     ***First***, the Trustee's claim fails because he has not established that any breach of the Agreement occurred.

63.     At trial, the Trustee never clearly articulated his theory of breach. The only evidence he introduced related to any of the at-issue lab claims was United's claims data and the testimony of his proffered expert witness, Mr. Herbers. But neither the claims data nor Mr. Herbers' unreliable testimony establishes that United breached the Agreement.

64.     United's data is not evidence of breach. It is merely transaction-level data reflecting information about the services that were billed to United, the amount Little River billed United, and how United adjudicated each claim. (June 13 Trial Tr. 587:1-6, 590:8-598:19 (Buchakjian); June 20 Trial Tr. 1877:5-20 (King).)

65.     The Agreement unambiguously allows United to deny claims for a host of valid reasons, and the Trustee did not identify anything in United's data that showed that any claim was adjudicated in violation of the Agreement.

66.     Nor did Mr. Herbers offer competent or reliable testimony that United breached the Agreement. Mr. Herbers admitted that he did not have an opinion about whether any claim was payable under the Agreement. (June 13 Trial Tr. 269:25-270:5 (Herbers).) That admission alone is enough for the Court to conclude that the Trustee cannot rely on Mr. Herbers to offer evidence of breach.

67.     The Court also finds that Mr. Herbers' testimony at trial demonstrated that he was unqualified to interpret United's data, and even if he had been, he lacked an articulable and replicable methodology for reaching the conclusions about the data that he did. Mr. Herbers conceded that he had no experience interpreting United's data, made no effort to educate himself on how to interpret the data, and that in each of the many attempts he made to analyze the data, he committed obvious errors in applying his own methodology. (June 11 Trial Tr. 96:1-99:20, 238:20-239:16 (Herbers).) Although Mr. Herbers repeatedly testified that his methodology for reaching his conclusions never changed (*e.g.,* June 11 Trial Tr. 221:5-14 (Herbers)), he was unable to articulate or apply that alleged methodology in a consistent, coherent way to the claims at trial. (June 11 Trial Tr. 222:13-250:23, 253:3-270:17 (Herbers).) In fact, Mr. Herbers conceded that if the Court were to apply his "methodology" to United's data, the Court could ***not*** reach the same conclusions that Mr. Herbers did. (June 11 Trial Tr. 20-23 (Herbers).) This was an apt admission, given that Mr. Herbers admitted his methodology was simply to apply his personal judgment and experience to determine which claims were or were not adjudicated properly by United, and the Court has no way to replicate Mr. Herbers' personal judgment and experience. (June 11 Trial Tr. 255:6-13, 258:1-4 (Herbers).)

68.     ***Second,*** the Trustee has proffered no reliable evidence to establish performance under the Agreement—another required element of his breach-of-contract claim. The Trustee never introduced evidence of the medical records, laboratory orders, laboratory results, patient admissions or consents, blood draws, or any United Customer Benefit Plans tied to any of the claims in Mr. Herbers' final damages analysis, despite the clear obligation in the Agreement for Little River to maintain all medical, administrative and financial records relevant to all claims for a period of six (6) years. (DTX-03 at 7 (Section 4.10).) As such, the Court is unable to conclude that any of the laboratory services allegedly underlying the claims billed to United were ever actually performed by anyone, much less

by Little River. Similarly, the Court is unable to conclude that any of the patients had any relationship to Little River, that Little River performed any services ███████████████████████████, or that the claims were otherwise payable under the Agreement.

69. The Agreement does not allow Little River to bill for testing that it did not perform, ████████████████████████████████████.

70. The Agreement is between Little River and United, no other providers are parties to the Agreement. (DTX-03 at 1; June 13 Trial Tr. 487:22-488:6, 489:1-22 (Martino).)

71. The Agreement only applies to services rendered by Little River. (DTX-03 at 29 (Section 2.1); June 13 Trial Tr. 539:13-540:7 (Martino).)

72. The Agreement also ████████████████████████████████████████ ███████████████████████████████████████████████████████ June 13 Trial Tr. 496:2-10, 497:22-498:1 (Martino); June 20 Trial Tr. 1845:9-1846:19 (King).)

73. As noted herein, the Trustee did not offer any evidence that Little River—as opposed to a non-contracted third-party laboratory—performed any of the tests underlying the at-issue claims. The only evidence about the tests presented at trial, offered by United, showed that Boston Heart and True Health—not Little River—performed the tests. (June 18 Trial Tr. 1427:22-1431:10 (Blum); June 14 Trial Tr. 1024:2-8 (Sheinberg); *see also* June 10 Trial Tr. 49:10-16 (Trustee Opening Statement); June 17 Trial Tr. 1251:13-1252:8 (Marioni), 1284:7-16 (Salinas); DTX-06; DTX-31.) The Agreement applies only to services that Little River performed, and the Court is not able to conclude, based on the evidence, that Little River performed any of the services underlying the at-issue claims—or any services at all, for that matter. The fact that Little River *billed* United for services is not evidence that Little River performed those services. (June 20 Trial Tr. 1877:5-20 (King).)

---

74.    The Trustee also did not offer any evidence that any of the tests underlying the at-issue claims were ███████████████████████████████████████. In fact, the Trustee conceded he likely could not have done so based on the facts introduced at trial. (June 10 Trial Tr. 281:20-282:1 (Studensky).) Meanwhile, as explained above, United presented evidence that the tests were performed by either Boston Heart or True Health at their laboratories in Massachusetts and Virginia, which are ███████████████████████. Because the Agreement ███████████████████████████████████████, this failure of proof dooms the Trustee's claim.

75.    ***Third***, the Trustee has not proven that Little River suffered any damages. The Trustee relied exclusively on Mr. Herbers to carry this burden and, for the reasons stated above, Mr. Herbers' testimony is completely unreliable. As a result, the Court will not credit it.

76.    Even were the Court to credit Mr. Herbers' testimony and apply his methodology[3] to calculate the damages suffered by Little River, however, it would conclude that Little River did not suffer any damages because United's contractual *over*payments on claims during the relevant time period exceeded any underpayments. During the contractual time period of October 2014 through September 2017, after accounting for reversals and other negative dollar amount transactions and excluding patients with Medicare or Medicaid, the total value of United's payments to Little River ██████████████████████ $1,694,668. (PTX-86.) This overpayment amount vastly outweighs the damages the Trustee proved that Little River had suffered—which are $0.

---

[3] Mr. Herbers testified that his methodology—which did not change throughout the course of this litigation—was to subtract overpayments United made from the total underpayments the Trustee proved. (June 13 Trial Tr. 276:16-277:19.)

---

77. ***Fourth***, the Trustee did not prove that Little River appealed any of the at-issue claims with United, which is a condition precedent to seeking recovery for those claims in this suit. It is the Trustee's burden to prove that any contractual conditions precedent were satisfied. *Note Inv. Grp., Inc. v. Assocs. First Cap. Corp.*, 83 F. Supp. 3d 707, 729 (E.D. Tex. 2015). Under Texas law, "[a] condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (quotation omitted).

78. United's annually published Administrative Guides are unambiguously incorporated by reference into the Agreement. *See Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1307 (S.D. Fla. 2019) (finding administrative guide incorporated into larger agreement where "the provider agreed to comply with policies and procedures that could be amended or revised from time to time in one party's discretion so long as the amendments or revisions do not contradict express terms in the original agreement."); *Bob Montgomery Chevrolet, Inc. v. Dent Zone Companies*, 409 S.W.3d 181, 189 (Tex. App. 2013) ("Unsigned documents may be incorporated into the parties' contract by referring in the signed document to the unsigned document.").

79. Here, the Agreement, including United's Administrative Guide, unambiguously requires Little River to appeal a claim denial to United ***before*** proceeding to outside dispute resolution. (*See* DTX-03 at 10 (Section 6.5); DTX-459 at 84 ("For disputes regarding the payment of claims, you ***must*** timely complete the claim reconsideration and appeal process as set forth in this Guide prior to initiating [further dispute resolution]." (emphasis added).)[4] This is a condition

---

[4] The Administrative Guide explicitly contemplates that appeals be completed prior to initiating "arbitration," which is the form of dispute resolution required by United's provider agreements, including the Agreement here. (DTX-03 at 12 (Article VII).) However, this matter

precedent to suit under the Agreement. *See Angelina Emergency Med. Assocs. P.A. v. Health Care Serv. Corp.*, No. 3:18-CV-0425-X, 2024 WL 102666, at *14 (N.D. Tex. Jan. 9, 2024) (dismissing provider's claims against health insurer for failure to satisfy appeals exhaustion requirement prior to bringing suit), *appeal docketed*, No. 24-10306 (5th Cir. Apr. 8, 2024).[5]

80.     The Trustee offered no evidence that Little River ever appealed a single one of the at-issue claims. In fact, United offered evidence that all but a tiny fraction of the claims were not appealed. As a result, the Trustee has not carried his burden of proof to show that the contractual conditions precedent were satisfied, and he cannot recover on his breach of contract claim.

81.     ***Fifth***, even if the Trustee had met his burden in establishing all required elements of a breach of contract for any of the services at issue, the Court finds that United's affirmative defense of Little River's prior material breach defeats any finding of liability. "[T]he contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense." *Compass Bank v. MFP Fin. Servs., Inc.,* 152 S.W.3d 844, 852 (Tex. App. 2005).

82.     The Agreement unambiguously required Little River to comply with the law in performing, and billing, the services at issue. (DTX-03 at 2 (Sections 2.1(iv) and 2.1(iii).) And United's Administrative Guide explicitly prohibited kickbacks for laboratory services. (DTX-459 at 66.) Each time that Little River submitted a claim to United under the Agreement, it certified

---

was never submitted to arbitration due to Little River's ongoing bankruptcy. The fact that United did not insist on enforcement of the arbitration provision of the Agreement does not excuse Little River of its obligation to appeal the claims in the first instance. This is especially true given that the claims at issue were adjudicated years before this lawsuit had been filed, so any required appeal would have been completed long before United or Little River made a decision about whether to arbitrate this dispute.

[5] United properly pled the failure to appeal claims as an affirmative defense in its Answer to the Trustee's operative Seconded Amended Adversary Complaint. (ECF No. 328 ¶¶ 72, 77, 80.)

that it had complied with the Agreement's requirements and all applicable laws, and that the claim was "valid." (DTX-03 at 2-3 (Sections 2.1(vi) and (iii)); PTX-78 (claim form certifying that "the billing information as shown on the face [of the form] is true, accurate and complete").)

83.     The record is replete with evidence, discussed above, that Little River paid kickbacks to physicians in exchange for lab test referrals. Kickbacks are illegal under Texas law: "[a] person commits an offense if the person knowingly offers to pay . . . any remuneration . . . to . . . another for securing or soliciting a patient or patronage . . . from a person licensed, certified, or registered by a state health care regulatory agency." Tex. Occ. Code § 102.001.

84.     Every time Little River submitted a kickback-tainted claim, it filed an untrue and invalid claim, breaching the covenants in Section 2.1 of the Agreement. Little River also repeatedly violated the Protocols in United's Administrative Guide, which prohibit kickbacks. United was not required to pay claims ███████████████████████████████████████████
███

85.     In sum, United has established by a preponderance of the evidence that Little River materially breached the Agreement by submitting claims tainted by illegal kickbacks. This material breach would excuse any breach by United as to these kickback-tainted claims, had the Trustee established any (he has not).

**B.     Trustee's Prompt Pay Claim**

86.     The Trustee's claim under the Texas Prompt Pay Act ("TPPA") fails for the same reasons.

87.     The TPPA sets deadlines for when an insurer must adjudicate a "clean claim" submitted by a provider. Tex. Ins. Code §§ 843.338, 1301.103. But an insurer is only required to pay the claim within those deadlines if the insurer first determines the claim is "payable." *See id.*

§ 843.338 ("if the [insurer] determines the entire claim is payable, [it must] pay the total amount of the claim in accordance with the contract between the physician or provider and the [insurer]" (emphasis added)), § 1301.103 (similar).

88.     The Trustee's damages witness, Mr. Herbers, agreed, conceding that TPPA penalties and interest are only owed on a claim if the Trustee first shows that the claim was underpaid by United. (June 11 Trial Tr. 85:20-23 (Herbers).)

89.     None of the claims for which the Trustee now seeks penalties and interest were underpaid (or payable) under the Agreement. As such, the Court finds and concludes that the Trustee has no basis to seek penalties or interest for those claims under the TPPA.

### C.     Trustee's Unfair Claim Settlement Practices Act Claim

90.     The only parties who have standing to sue under the Texas Unfair Claim Settlement Practices Act ("UCSPA") are parties to the insurance contract—*i.e.*, United's members. Third parties like Little River (or the Trustee) lack standing to pursue an UCSPA claim, and UCSPA claims may not be assigned. *Angelina Emergency Med. Assocs. PA v. Health Care Serv. Corp.*, 506 F. Supp. 3d 425, 436-37 and n.48 (N.D. Tex. 2020) (citing *PPG Indus., Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 82 (Tex. 2004); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 384 (Tex. 2000); *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 150 (Tex. 1994) and dismissing UCSPA claim brought by groups of physicians against insurance companies which alleged that physicians were underpaid for services provided to companies' members); *see also Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc*., 620 S.W.3d 458, 468–69 (Tex. App. 2021) (holding that "the overwhelming weight of persuasive authority holds that claims under chapter 541 of the Texas Insurance Code may not be assigned" and dismissing UCSPA claim brought by physicians against insurer), *aff'd*, 659 S.W.3d 424 (Tex. 2023).

91.     As a result, the Trustee does not have standing to pursue his UCSPA claim, and it necessarily fails.

92.     Even if the Trustee had established standing in contravention of well-established Texas law and jurisprudence, the UCSPA claim fails for the same reasons as his other claims— namely, he has failed to show that any of the claims were payable or that Little River acted in accordance with applicable laws.

### D.     Trustee's Declaratory Judgment Claim

93.     Finally, the Trustee seeks a declaratory judgment that United breached the Agreement and violated the TPPA and UCSPA, as well as attorney fees. For the reasons set forth above with respect to those causes of action, the Court finds and concludes that the Trustee is not entitled to a declaratory judgment on those bases.

### E.     United's Proofs of Claim

94.     United's proofs of claim act as prima facie evidence supporting United's case, and without rebuttal are alone a sufficient basis to find in United's favor. (POCs 398 and 466.) *See In re Palms At Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005) (citing *Matter of Fid. Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988)) ("Under Rule 3001(f) of the Federal Rules of Bankruptcy Procedure, a party correctly filing a proof of claim is deemed to have established a prima facie case."). In order to overcome United's proofs of claim, the Trustee must put forth evidence sufficient to rebut United's prima facie showing on each claim. *In re Leverett*, 378 B.R. 793, 799 (Bankr. E.D. Tex. 2007) ("The claimant will prevail ***unless*** the objecting party produces evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." (emphasis added).) As detailed herein, the Trustee has not done so.

95.     United's proofs of claim contain three bases. First, they assert that Little River breached the Agreement by improperly representing that the claims it submitted were valid claims, submitting claims for services that were not performed at Little River facilities or for Little River patients, failing to collect cost sharing obligations from United Members, improperly assigning the Agreement to True Health, and violating the Agreement's confidentiality provisions. (POCs 398 and 466 at 7-8.) Second, they assert that Little River tortiously interfered with United's contracts with its members by routinely waiving or capping member payment obligations. (*Id.* at 8.) Third, the proofs of claim assert that Little River fraudulently and negligently misrepresented the facts of its fraudulent billing scheme from United. (*Id.* at 8.) United's proofs of claim assert that Little River's conduct caused United to pay numerous claims for laboratory services that it should not have had to pay under the Agreement, damaging United in the amount of $39,418,692.14. (*Id.* at 2, 4, 7, 9.)

96.     The laboratory services claims at issue in United's proofs of claim are different from the ones at issue in the Trustee's adversary claims. As set forth above, the Trustee's breach-of-contract cause of action is based on claims that United paid at ███████████████ on for a host of valid reasons. United's proofs of claim, on the other hand, are based on claims that United actually did pay, but should not have paid because of Little River's breaches.

97.     United identified the claims in its proofs of claim by identifying all the laboratory claims in Little River's claims data provided to members who were further than 50 miles from Little River—a conservative threshold given the location of other healthcare providers in the area. (June 20 Trial Tr. 1561:7-1562:2 (Mancini).)

98.     But while the set of claims at issue are different, the facts about Little River's billing and kickback scheme are the same and apply to both the adversary proceeding and the proofs of

claim. Based on the evidence described above, the Trustee failed to rebut United's prima facie showings that Little River submitted invalid claims; submitted claims for services that were not performed at Little River facilities or for Little River patients; failed to collect cost-sharing obligations from United members; improperly assigned the Agreement to True Health; violated the Agreement's confidentiality provisions; tortiously interfered with United's contracts with its members; or fraudulently and negligently misrepresented the facts of its fraudulent billing scheme from United.

99.    In fact, the Trustee's own experts admitted these things occurred. (*See, e.g.*, June 12 Trial Tr. 227:8-12 (Nelson).) The Trustee merely contended the conduct was not prohibited under the parties' Agreement. (*Id.* at 227:13-15; ECF No. 478 at 15-17.) Because the conduct is prohibited, and because the Trustee admits the conduct occurred, the Trustee cannot rebut United's prima facie case.

100.    In the alternative, even if the Trustee *had* introduced evidence to rebut the assertions in United's proofs of claim, the burden would merely shift to United to prove the assertions in its proofs of claim. *In re Leverett*, 378 B.R. at 799. United has done so in at least two respects:

101.    First, based on the evidence of Little River's billing practices described above (and incorporated here by reference), United has established by a preponderance of the evidence that Little River routinely billed United for laboratory testing services provided by third-party laboratories like Boston Heart and True Health at ███████████████████████. Because Little River caused United to pay for services that Little River did not perform and ███████████████████████████ both requirements of the Agreement, Little River materially breached the Agreement.

102.    Second, based on the evidence of Little River's kickback scheme described above (and incorporated here by reference), United has established by a preponderance of the evidence that Little River paid illegal kickbacks to physicians and billed claims tainted by kickbacks to United. These claims were not true and correct, were not valid, and violated United's Agreement and the protocols incorporated therein. Because Little River caused United to pay for services that were tainted by illegal kickbacks, Little River materially breached the Agreement.

103.    As a result of these breaches, as well as Little River's other conduct detailed in United's proofs of claim, United suffered damages in the amount of $39,418,692.14.

Dated: July 26, 2024

By:   _/s/ Marcus A. Guith_

**ROBINS KAPLAN LLP**
Munir R. Meghjee (Admitted PHV)
Jeffrey S. Gleason (Admitted PHV)
Jamie R. Kurtz (Admitted PHV)
John K. Harting (Admitted PHV)
Marcus A. Guith (Admitted PHV)
Kyle D. Nelson (Admitted PHV)
Erica D. Rosenbaum (Admitted PHV)
Brent A. Murcia (Admitted PHV)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
T: (612) 349-8500
F: (612) 339-4181
mmeghjee@robinskaplan.com
jgleason@robinskaplan.com
jkurtz@robinskplan.com
jharting@robinskaplan.com
mguith@robinskaplan.com
knelson@robinskaplan.com
erosenbaum@robinskaplan.com
bmurcia@robinskaplan.com

  - and -

**SHIPMAN & GOODWIN LLP**
Eric S. Goldstein (admitted PHV)
One Constitution Plaza
Hartford, CT 06103
T: (860) 251-5000
F: (860) 251-5099
egoldstein@goodwin.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2024, the foregoing was filed electronically with the United States Bankruptcy Court for the Western District of Texas through the Court's CM/ECF system, and was sent to counsel for the plaintiff by email or via electronic notice through the Court's CM/ECF System, as set forth below:

<u>VIA CM/ECF</u>
Brian T. Cumings
Matt Powers
William Christian
Marianne Nitsch
GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, TX 78701
bcumings@gdhm.com
mpowers@gdhm.com
wchristian@gdhm.com
mnitsch@gdhm.com

<u>VIA CM/ECF</u>
Lynn Hamilton Butler
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701

<u>VIA CM/ECF</u>
Katherine Battaia Clark
Thompson Coburn LLP
2100 Ross Avenue, Suite 3200
Dallas, TX 75201
kclark@thompsoncoburn.com

<u>VIA CM/ECF</u>
Tamara D. Baggett
Jimmy D. Parrish
Baker & Hostetler LLP
2850 North Harwood Street, Suite 1100
Dallas, Texas 75201

<u>VIA CM/ECF</u>
Michael Fishel
Sidley Austin LLP
1000 Louisiana, Suite 6000
Houston, TX 77002

*/s/ Marcus A. Guith*