

**Signed October 29, 2024.**

_____
**Ronald B. King**
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| LITTLE RIVER HEALTHCARE HOLDINGS, LLC, ET AL., | § § § § | CASE NO. 18-60526-RBK |
| DEBTORS. | § § | CHAPTER 7 |
| | § § | |
| JAMES STUDENSKY, CHAPTER 7 TRUSTEE FOR LITTLE RIVER HEALTHCARE HOLDINGS, LLC, ET AL., | § § § § § § | |
| PLAINTIFF, | § § | |
| V. | § § | ADVERSARY NO. 20-06093-RBK |
| UNITEDHEALTHCARE INSURANCE CO., ET AL., | § § § | |
| DEFENDANTS. | § | |

1

# OPINION

## I. INTRODUCTION

This adversary proceeding was filed by James Studensky, chapter 7 trustee for Little River Healthcare Holdings, LLC, et al. (the "Trustee"). The Trustee sought recovery of damages for the denial of healthcare claims by UnitedHealthcare Insurance Company, United Healthcare of Texas, Inc., UnitedHealthcare Benefits of Texas, Inc., and UnitedHealthcare Community Plan of Texas, L.L.C. (collectively, "United"). The Trustee also objected to the proofs of claim filed by United. The Court finds that the Trustee's requested relief should be denied.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 157(b) & 1334(a), and the Standing Order of Reference of the United States District Court for the Western District of Texas dated October 4, 2013. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), & (E). Venue is proper under 28 U.S.C. §§ 1408 & 1409. This Opinion shall constitute the findings of fact and conclusions of law of the Court. FED. R. BANKR. P. 7052.

## III. BACKGROUND

### A. Facts

Little River Healthcare Holdings, LLC and seven related entities (collectively "Little River") filed voluntary chapter 11 bankruptcy cases on July 24, 2018. The debtors owned and operated a small rural hospital in central Texas along with other healthcare related entities. After Little River unsuccessfully attempted to reorganize, the jointly administered cases were converted to chapter 7 on December 7, 2018. Until conversion of the cases to chapter 7, Little River operated a twenty-five-bed critical care hospital in Rockdale, Texas.

2

United is in the business of providing healthcare insurance and health insurance-related services. United has members all over the United States and it needs healthcare providers wherever United members are located. Some United plans are traditional healthcare insurance while others are self-insured plans. Either way, United is a "payer." Under various healthcare plans, United does not customarily pay full claim amounts to healthcare providers, but rather under a fee schedule or a fixed percentage of billed charges. Small town hospitals have a difficult time surviving because of low volumes of patients and limited financial resources. Because of low volumes, critical care rural hospitals often receive a higher level of payment on their submitted claims to commercial healthcare payers in order to provide healthcare services to the payer's members. For this reason, United provided Little River with a favorable fixed percentage of billed charges reimbursement which exceeded that of larger urban hospitals and other healthcare providers.

Little River entered into a Facility Participation Agreement ("FPA") with United on October 1, 2014, to become an in-network provider for United (DTX-3). The FPA was the operative base contract between United and Little River, but it was not comprehensive in its terms. The FPA specifically referred to protocols, administrative guides, and manuals which United implemented, revised, or supplemented from time to time. Some of the administrative guides, protocols, and manuals were implemented subsequent to the signing of the FPA but were nonetheless enforceable under the FPA as part of the overall agreement between the parties (DTX-3, §4.4). The FPA governed commercial healthcare benefits as well as federally funded healthcare benefits under Medicare and Medicaid laws and regulations.

3

After conversion to chapter 7, the Trustee filed adversary proceedings against various parties for preferences, fraudulent transfers, breach of contract, and tort claims. The Trustee filed this adversary proceeding against United because of the alleged improper denial of healthcare claims submitted to United by Little River. United responded that Little River had improperly billed pass-through claims for laboratory testing and had paid kickbacks to healthcare providers who used Little River for lab testing. United filed two proofs of claim alleging breach of contract and other claims against Little River (DTX 2443 & 2444).

United's motion to withdraw the reference of this adversary proceeding was denied by the district court. After almost four years of motions to stay, motions to withdraw reference, motions to dismiss, discovery disputes, motions to compel, motions for protective order, motions for summary judgment, motions to seal, and motions in limine, this Court conducted an eight-day evidentiary bench trial.

**B. The Parties' Claims**

The Trustee filed this adversary proceeding alleging causes of action for the nonpayment or underpayment of healthcare claims, plus penalties and interest. After dismissing certain statutory, contract, and tort claims, the Trustee's extant claims are for breach of contract, violations of the Texas Prompt Pay Act, violations of the Texas Unfair Claim Settlement Practices Act, and declaratory judgment. The Trustee also objected to the United proofs of claim. United filed two proofs of claim against Little River for breach of contract, tortious interference, and for defrauding United into paying more than $39 million for laboratory testing and other claims that were not payable under the FPA.

IV.    DISCUSSION

The first critical issue to be decided is whether Little River could validly engage in "pass-through billing" for laboratory testing services performed by off-site labs which were not in-network with United. The second issue concerns providers who used Little River for laboratory testing but received commissions or kickbacks. The third issue is whether United systematically and wrongfully denied or underpaid claims for lab testing done by Little River and by out of network diagnostic labs. The final issue is whether the proofs of claim of United should be allowed.

**A. Pass-Through Billing**

The Trustee's expert on the pass-through billing issue was Katherine Nelson, a lawyer who is well qualified with many years of experience in the healthcare industry. She obtained her bachelor's degree from Texas Tech University, Juris Doctor degree from Baylor University, and her L.L.M. from Southern Methodist University Law School. Ms. Nelson engaged in consulting and arbitration related to healthcare and retired after being a partner with the DLA Piper law firm. She previously served as chief counsel for the inspector general at the Texas Health & Human Services Commission.

After objections and a motion in limine, the Ms. Nelson was instructed not to opine on issues of law because her testimony would not be admissible. ***Renfroe v. Parker***, 974 F.3d 594, 598 (5th Cir. 2020); *see also **United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc***., 949 S.W.2d 707, 713 (Tex. App. – San Antonio 1997, writ denied) (Texas law). She limited her expert testimony to customs in the industry and her understanding of the FPA. Her opinion was that pass-through billing is common in healthcare and is appropriate where a provider is unable

5

or unwilling to perform the laboratory testing ordered by a provider and a reference lab is available to perform the testing. She testified that she knew that Little River and other providers would bill for reference lab testing but the FPA and customs in the industry allowed Little River to do that with its usual fixed percentage of billed charges. She did not testify whether the reference lab was out of network or whether the lab charges could be marked up by Little River. When asked about FPA provisions apparently to the contrary, she said that Little River was allowed to subcontract lab work, the FPA would permit that, and that customs in the industry allowed it. Ms. Nelson also testified that kickbacks in federally funded healthcare are illegal but not necessarily in commercial insurance. She testified that the FPA did not address kickbacks in commercial insurance.

United's expert had a differing view of pass-through billing. Carl King (no relation to the Court) is well qualified in the healthcare industry by education and experience. He has a bachelor's degree from Georgia State University and a master's degree in healthcare administration from Duke University. He served as president of Aetna of Texas, a subsidiary of one of the "big four" health insurance companies. He worked on the payer side for Aetna, and when working on the provider side he managed hospitals, clinics, surgery centers, home health, and managed care plans.

Mr. King testified that the FPA covered lab testing only at the sixteen Little River locations. Most contracts between payers and providers specifically prohibit billing for out of network providers at the in-network rate. Mr. King and United employee witnesses pointed to specific provisions in the FPA that address the issue including:

1. The FPA applies only to services performed at sixteen specified Little River locations in the central Texas area (FPA § 3.1).

6

2. The locations specified could be modified only upon written agreement of the parties (FPA § 3.1).

3. The FPA cannot be assigned by Little River (FPA § 9.4).

4. Only United and Little River have rights under the FPA (FPA § 9.6).

5. Little River was bound by United's protocols, including current or subsequently adopted administrative guides and manuals (FPA § 4.4).

6. United's 2014 and 2015 Administrative Guides provided:

**Laboratory services protocol**

**Requirement to use participating laboratories**

This protocol applies to all participating physicians and health care professionals, *and it applies to all laboratory services, clinical and anatomic, ordered by physicians and health care professionals*. . . .

You are required to refer laboratory services to *a participating laboratory in our network*, except as otherwise authorized by us or a Payer" (DTX-457 at 52; DTX-458 at 59; Tr. at 1921, testimony of Carl King) (emphasis added).

7. The 2015 Administrative Guide added that "for laboratory services, you will only be reimbursed for the services for which *you* are certified through the Federal Clinical Laboratory Improvement Amendments (CLIA) to perform" (DTX-458 at 73) (emphasis added).

8. United's 2014 and 2015 Administrative Guides provided: "Referrals for laboratory services that results in the physician earning a profit . . . are not allowed . . . Failure to comply with this protocol may result in . . . [t]ermination of network participation, as provided in your agreement with us." (DTX-457 at 53; DTX-458 at 59-60; Tr. at 1919, testimony of Carl King).

7

Mr. King and other witnesses testified that Little River had sixteen locations in central Texas which were listed in the FPA. Little River had the ability to do lab testing on site, but extensive offsite lab testing began with proprietary advanced lipid tests being sent to Boston Heart Diagnostics in Massachusetts or True Health Diagnostics in Virginia and Frisco, Texas. Those diagnostic labs were not approved as United in-network providers and more recently have been accused of violating the Anti-Kickback statute for federally funded healthcare. Little River began sending the majority of lab tests (proprietary and nonproprietary) to Boston Heart or True Health and billed United with Little River's generous fixed percentage of billed charges. In fact, Little River would triple or quintuple the lab fees charged by Boston Heart or True Health and bill that multiple to United as if Little River had performed the lab testing.[1] Other lab testing was marked up by hundreds or thousands of dollars. That practice increased the cost of healthcare without enhancing quality. Because United and other payers utilize electronic adjudication of claims, United was unaware of the pass-through billing until the volume of laboratory testing increased exponentially. For example, one exhibit showed an increase in lab testing claims from $100,000 in 2014 to $6,000,000 during the first nine months of 2016 (DTX-432 at 11).

Based on the internal communications of Little River which were admitted in evidence, as well as the tremendous spike in lab testing billings, it is undisputed that Little River embarked on an "outreach" marketing campaign to increase its gross income, and thereby its profits, by offering diagnostic lab testing services to providers outside the local area of Rockdale and central Texas (DTX 7 & 507). A reference laboratory transaction ordinarily involves a provider (a doctor) sending a requisition to a local referring lab (Little River), which in turn sends a requisition to the

---

[1] An internal email dated April 16, 2015 from the CEO of Little River stated: "Man, that's a lot. What do y'all think. This is at 5 times Medicare. Correct?" (DTX-467).

reference lab (Boston Heart), because the referring lab is unable or unwilling to perform the lab testing. Evidence was admitted showing that healthcare providers (usually doctors) in Austin, San Antonio, Houston, and Oklahoma, many of which were hundreds of miles away from Little River, were recruited by marketers and medical service organizations ("MSOs") to send their lab testing either to Little River or directly to Boston Heart or True Health. But either way they were using Little River, a far-away small-town hospital, to bill United at a favorable percentage of billed charges for the lab testing services. Most of the individuals having lab testing had never heard of Little River. To avoid the appearance of pass-through billing, Little River paid phlebotomists in various remote locations (usually doctor's offices) to draw blood and take specimens so that Little River could claim that it was doing the lab testing. The specimens were almost always shipped directly to Boston Heart or True Health because they were doing most of the actual testing. There was evidence that requisitions for lab tests were often sent by providers directly to Boston Heart or True Health rather than Little River such that Little River was out of the loop. Then Little River would multiply the fees or add hundreds or thousands of dollars and bill United at its fixed percentage of billed charges for the so-called "reference laboratory" tests.

The Trustee argued that the administrative guides' requirement to use participating laboratories for laboratory testing applied only to "physicians and healthcare professionals" but not to hospitals such as Little River. That argument overlooks the specific language that follows which states "*and it applies to all laboratory services, clinical and anatomic, ordered by physicians and health care professionals*" (DTX-457 at 52; DTX-458 at 59; Tr. at 1921, testimony of Carl King) (emphasis added). The diagnostic laboratory tests at issue were ordered by physicians and healthcare professionals. If the lab tests were billed by Little River but actually

9

performed by Boston Heart or True Health, Little River was a mere pass-through biller as part of a purported "reference lab" transaction and the administrative guide provision applied.

The outreach marketing campaign by Little River and MSOs to secure lab testing for healthcare providers hundreds of miles away, payments to phlebotomists, and billing out of network third-party lab work as if it were performed by Little River, was merely a scheme of Little River to dramatically increase its volume of lab testing and profits. Obviously, the vast majority of lab tests were not for patients in any of the Little River facilities in central Texas. Little River executives viewed it as a loophole to be exploited. But it was a violation of the FPA and the administrative guides.

### B. Financial Compensation to Providers (a/k/a Commissions or Kickbacks)

The second issue concerns financial consideration paid to providers who were recruited to use Little River, directly or indirectly, to perform lab testing services. There was a plethora of evidence that a scheme was devised and implemented to create financial incentives for doctors and other providers to use Little River to perform and bill their laboratory testing. Little River and its outside marketers participated in the creation of MSOs paid by Little River which offered partial ownership to doctors who sent lab testing to Little River. In return for buying a small percentage of ownership in an MSO, the doctor would receive periodic monetary payments from the MSO for lab testing sent to and billed by Little River. United characterized the payments as commissions or kickbacks.

Commissions or kickbacks are illegal for Medicare, Medicaid, and other federally funded healthcare programs. 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute"); ***United States v. Robinson,*** 505 Fed. Appx. 385, 387 (5th Cir. 2013); ***United States v. Marlin Med. Solutions LLC***,

10

579 F.Supp.3d 876, 884 (W.D. Tex 2022). There was ample evidence that Little River, Boston Heart, and True Health insiders and some of the providers who sent Medicare or Medicaid lab testing to Little River and subsequently paid or received commissions from MSOs have been indicted by the Department of Justice. At the time of trial, some had plead guilty, some were waiting for trial, and some had gone to trial and received an adverse jury verdict. Two witnesses who allegedly paid or received kickbacks for federally funded healthcare testified at trial and invoked the Fifth Amendment. Two other witnesses testified at trial that the Little River scheme to pay commissions for federally funded healthcare has adversely affected their lives. One was a doctor who received commissions, lost most of his practice, and is still struggling financially. The other witness was an MSO manager who created an MSO, recruited doctors, and paid commissions. Both were indicted and plead guilty (DTX 2355 & 2363).

With respect to commercial healthcare benefits, the commission or kickback issue is not as clear as with federally funded programs. Mr. King testified for United that he disagrees with Ms. Nelson about kickbacks, and he believes that the Texas Anti-Kickback statute prohibits kickbacks in the commercial insurance arena. Neither of the Trustee's expert witnesses would vouch for the legality of kickbacks in commercial healthcare benefits. Most healthcare payers, including United, contractually prohibit commissions or kickbacks paid to providers. The Texas statute that prohibits commissions and kickbacks in healthcare is often cited in Medicare or Medicaid kickback cases. It appears to apply to commercial healthcare benefits, but the statute has seldom been cited in civil disputes in the commercial healthcare context. *See* TEX. OCC. CODE ANN. § 102.001; TEX. HUM. RES. CODE ANN. § 32.039(B)(1-D) (the Texas Medicaid Fraud Prevention Act or "TMFPA"); *cf*. ***Mission Toxicology, LLC v. UnitedHealthcare Ins. Co.***, 499 F.Supp.3d 350, 369 (W.D. Tex. 2020) (no private cause of action conferred by statute for kickbacks); ***Aetna Life Ins. Co. v.***

11

*Humble Surgical Hosp., LLC*, 2016 WL 7496743 at *2 (S.D. Tex. 2016) (kickbacks recoverable as money had and received).

Whether the Texas Anti-Kickback statutes apply to private commercial healthcare insurance disputes is not dispositive. The FPA, through the various protocols, administrative guides, and manuals, specifically prohibits commissions or kickbacks to healthcare providers. The language could not be clearer:

> **Laboratory services protocol**
>
> ….
> Self-Referral and Anti-Kickback
>
> This protocol applies to all participating physicians and health care professionals, *and it applies to all laboratory services, clinical and anatomic, ordered by physicians and health care professionals*. Referrals for laboratory services that results [sic] in the physician earning a profit, including, but not limited to the following, are not allowed:
>
> Profits resulting from an investment in an entity for which the referring physician or health care professional generates business; or
>
> Profits resulting from collection, processing and/or transport of specimens,
>
> Failure to comply with this protocol may result in:
>
> A decreased fee schedule; or
>
> Termination of network participation, as provided in your agreement with us.

2014, 2015, and 2016 Administrative Guides (DTX 457 at 52-53; DTX 458 at 59-60; DTX 459 at 57-58; Tr. at 1919, testimony of Carl King) (emphasis added). Mr. King testified that kickbacks skew a doctor's judgment. The payment of kickbacks by Little River makes claims unpayable and constitutes a violation of the FPA.

### C. Denial or Underpayment of Healthcare Claims

After conversion to chapter 7, former employees of Little River maintained that some payers owed Little River millions of dollars due to the systematic denial or underpayment of

medical claims. One such claim against another healthcare payer was pending before the conversion to chapter 7 and went to arbitration. The claims against United were not formally asserted until the Trustee filed this adversary proceeding.

The Trustee in this case inherited (or was dumped on) an extremely difficult and complex maze of corporate and medical records with very little assistance from former employees who were on the scene prior to the closing of the hospital. The Trustee retained some of the Little River accounting and billing staff for a short time to maintain medical records and bill medical payers for services rendered pre-conversion to Little River patients. The task was difficult. Little or no cash was left on hand at conversion to chapter 7 but some funding was provided by the secured creditor. Cerner, the healthcare software firm used by Little River for medical accounting, initially provided support to the Trustee but soon withdrew it. The Trustee was not able to obtain another healthcare software firm that could handle the records and was left with a disorganized mass of medical records in native format. In many cases the records were incomplete and difficult to interpret even though the Trustee intended to pursue causes of action against certain creditors and third parties.

The Trustee's expert witness was Mr. Mark Herbers. He is a qualified healthcare expert who has been involved in the industry for over 40 years. He has a B.S. degree from Georgetown University and an M.B.A. from Washington University in St. Louis. He has served as chief executive officer, chief financial officer, and chief operating officer of various healthcare providers. He has also served as a healthcare consultant with Alix Partners and as an interim CFO. He is now retired but is still finishing four consulting cases.

One of the most contentious issues has been the opinions and testimony of Mr. Herbers. His ultimate conclusion was that United engaged in a systematic denial of Little River claims. He analyzed various codes assigned by United to Little River claims and determined that United had placed "hard denials" and "soft denials" on claims that were not justified. Mr. Herbers reviewed the records provided by the Trustee to opine on the issues, but he was forced to greatly revise his methodology and analysis on several occasions when confronted with additional records provided by United. As discovery continued over a long period of time, three "updated" methodologies and analyses gradually came from Mr. Herbers to United. Mr. Herbers' analyses became a moving target for United to attempt to evaluate. The damages estimates for claim denials provided by Mr. Herbers (including penalties and interest) began at forty million dollars, declined to twenty million dollars, and finally rested in the seven and a half million-dollar range at trial. United tried to disqualify the testimony of Mr. Herbers by filing ***Daubert*** [2] motions and motions in limine until trial and post-trial. The pretrial ***Daubert*** motions were denied and the Court held that the objections went to the weight of the evidence.

United provided expert opinion evidence through its witness, Mr. Jeffrey Buchakjian. Mr. Buchakjian obtained his bachelor's degree from Towson University. He is a certified public accountant, certified in financial forensics, and is a qualified healthcare expert witness. He has conducted investigations of healthcare entities and testified in twenty cases as an expert.

Mr. Buchakjian testified that Mr. Herbers' analysis was fatally flawed. Mr. Herbers relied on unreliable data and did not find damages with a reasonable certainty. The analysis did not consider the pass-through billing and kickbacks that were undisputedly paid. The provider's data

---

[2] ***See Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S.Ct. 2786 (1993).

and the payer's data should match but they did not match in Mr. Herbers' analysis and the most reliable data would have come from United. Mr. Buchakjian found no systematic denial of claims. Mr. Herbers had summaries but not complete "835" and "837" data (the electronic communications between Little River and United regarding claims) which are the most reliable. The remittance advice remark codes ("RARC" codes) and claim adjustment reason codes ("CARC" codes) were misinterpreted by Mr. Herbers and therefore tainted the entire analysis. Mr. Herbers sometimes double or triple counted claims that were initially denied but were later resubmitted and paid. Some claims were denied because of previous payment by United but were counted in the damages as denials of claims. Mr. Herbers did not credit overpayments by United to the damages calculation. Only a few dozen out of tens of thousands of claims were appealed by Little River but Mr. Herbers assumed timely appeals of all denied claims. Mr. Herbers' damages analysis changed from one report to the next but was never accurate.

The Court finds that the upshot of all this is that Mr. Herbers did not have good and accurate information. He made many mistakes based on the evidence on which he relied. More records could have been requested of United by the Trustee and Mr. Herbers (*e.g.*, complete "835" and "837" billing records). But Mr. Herbers' analysis was flawed by the records he used and his misinterpretation of the various codes that were assigned by United to healthcare claims billed by Little River. Without complete knowledge of the meaning and importance of the codes, Mr. Herbers was not able to formulate an accurate opinion on the "systematic denial codes" about which he testified at length. Many of the codes that he believed were denial codes were actually placeholders in the form of requests for further information or supporting documentation from Little River for which there was no proof that Little River ever responded. Mr. Herbers did not have or review provider requisitions for lab tests or provider remittance advices. He did not review

15

any actual claims or backup documentation for claims sent to United. He did not consider cost sharing for patient financial responsibility. He did not review whether the lab tests were medically necessary or whether proper documentation was provided with a claim. He did not have complete "835s" or "837s." He was unaware that some claims had multiple claim numbers. He gave no opinion as to whether "pass-through billing" for an out of network diagnostic testing lab was appropriate or the effect of the payment of kickbacks by Little River. He assumed timely submission of claims and timely submission of appeals but only a few dozen out of tens of thousands of claims were appealed by Little River. He did not credit overpayments by United.

The ***Daubert*** motions and motions in limine targeted at Mr. Herbers' testimony and expert opinions were understandably filed. In a pretrial ***Daubert*** hearing, however, it is impossible to predict what testimony will be adduced at trial. It is not the function of the court to preclude testimony of a qualified expert which may be helpful to the trier of fact unless the expert opinions are clearly inadmissible. Mr. Herbers' testimony was admissible but it did not carry the burden of proving the elements of the causes of action for denial or underpayment of claims.

### D. United's Proofs of Claim

The proofs of claim filed by United are presumed valid unless rebutted by the objecting party with evidence that "bursts the bubble" of the presumption.[3] FED. R. BANKR. P. 3001(f); ***In re Al Copeland Enters., Inc***., 1998 WL 412967 at *2 (5th Cir. 1998) ("[o]ne objecting to a claim has the burden of presenting a substantial factual basis to overcome that prima facie validity of the

---

[3] "[T]his Court clearly adopted a 'bursting bubble' theory of presumptions . . . [T]he *only* effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact. If the party against whom the presumption operates produces evidence challenging the presumed fact, the presumption simply disappears from the case." ***Pennzoil Co. v. Federal Energy Regulatory Comm'm***, 789 F.2d 1128, 1136-37 (5th Cir. 1986) (emphasis in original).

proof of claim"); ***In re Fidelity Holding Co.***, 837 F.2d 696, 698 (5th Cir. 1988); ***NexPoint Advisors, L.P. v. Kirschner***, 2024 WL 3239927 at *13 (N.D. Tex. 2024). The validity of the United proofs of claim has not been rebutted because of the failure of proof of the denial or underpayment of valid healthcare claims by United. Further, Little River violated the FPA by engaging in pass-through billing of out of network diagnostic lab testing and by paying kickbacks to healthcare providers.

V. CONCLUSION

The Trustee's requested relief will be denied and the proofs of claim filed by United will be allowed. A separate judgment will be rendered.

# # #